**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No.: _____

WILLIAM NORRIS,

      Plaintiff,

               v.

UNIVERSITY OF COLORADO, BOULDER (through its Board, the Regents of the University of Colorado, a body corporate) and

PHILIP P. DISTEFANO,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff William Norris (hereinafter referred to as "Plaintiff" or "Mr. Norris"), by his attorneys Nesenoff & Miltenberg, LLP, and Foster Graham Milstein and Calisher, LLP, as and for his complaint against Defendants University of Colorado at Boulder and Philip P. DiStefano respectfully alleges as follows:

## THE NATURE OF THE ACTION

      1.    This action arises from an egregious miscarriage of justice against Plaintiff through the University of Colorado at Boulder's ("CU Boulder" or the "University") flawed and biased Title IX sexual misconduct process, carried out under a presumption of guilt, and willful ignorance of major inconsistencies in the complainant, "Jane Roe's,"[1] false allegations of nonconsensual

---

[1] Jane Roe is a pseudonym.

sexual contact against Plaintiff. Concerns with Jane Roe's credibility were never raised by University investigators, nor was her account questioned, because CU Boulder trains its staff to adopt a trauma-informed approach which discourages the thorough questioning of complainants in the sexual misconduct process to avoid further trauma.

2.      Without sufficient supporting evidence, the University suspended Plaintiff—who had only 6 credits left towards his bachelor's degree—for a period of eighteen months. At the time, Plaintiff—who had an unblemished disciplinary and academic record—was enrolled in AFROTC and lost his scholarship, incurring major debt to the federal government. His anticipated career in the Air Force was also sidelined.

3.      Jane Roe's false allegations were also the subject of a negligent criminal investigation by the Boulder Police Department ("BPD"). CU Boulder's Title IX investigators relied on BPD interviews in evaluating Jane Roe's University complaint and to fabricate "inconsistencies" in Mr. Norris' account of what happened when there were none.

4.      CU Boulder administrators—facing pressure from the U.S. Department of Education and former Vice President Joseph Biden to protect female sexual assault complainants—worked together with the BPD in an effort to bolster their cases against Mr. Norris, despite a glaring lack of evidence to support Jane Roe's allegations. This included withholding information from Mr. Norris until after BPD interviewed him.

5.      Recognizing the lack of credible evidence against Mr. Norris in the criminal case, in October 2017 a jury acquitted him of all charges.

6.      Because Mr. Norris was subjected to a biased and flawed process pursuant to which only *two* individuals (one with a conflict of interest) were responsible for investigating the case

and issuing a finding, and *one* individual—CU Boulder's Title IX Coordinator—was responsible for sanctioning *and* reviewing his appeal, Mr. Norris' sanction remains in his educational record and he has not obtained his bachelor's degree from the University, which he had anticipated receiving in 2016.

7.      Mr. Norris' case is an exemplar of the injustice that occurs as a result of colleges and universities applying a low burden of proof, the preponderance of the evidence standard, in sexual misconduct cases. Under this scenario, an individual may be found not guilty and acquitted of all charges in a criminal case but may still have his academic and career goals sidetracked or even destroyed.[2]

8.      Mr. Norris' case also highlights the problem of colleges and universities, including CU Boulder, investigating and adjudicating allegations against students prior to the conclusion of any parallel criminal case.

9.      As a result of Defendants' imposition of the unwarranted and erroneous sanction against Plaintiff, he has sustained economic injuries, the loss of educational and career opportunities and emotional distress.

10.      CU Boulder's investigation and adjudication of Jane Roe's allegations were tainted by gender bias resulting from federal and local pressure to protect female victims of sexual violence, and to reform CU Boulder's policies to take a hard line against male students accused of sexual misconduct. As a result, Plaintiff was deprived of a fair and impartial hearing with adequate due process protections, as mandated by the United States Constitution.

---

[2] In September 2017 the United States Department of Education repealed the April 2011 Dear Colleague Letter and issued new guidance permitting colleges and universities to apply the "clear and convincing evidence standard."

11.     When Defendants subjected Plaintiff to disciplinary action they did so in a way that deprived him of due process and discriminated against him because of his gender. CU Boulder's policies and regulations as promulgated are biased and discriminatory. While CU Boulder significantly departed from these policies and regulations in Plaintiff's case, the regulations and policies they did follow were insufficient to protect the rights of male students accused of sexual misconduct.

12.     Plaintiff therefore brings this action to obtain relief based on claims for violations of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process, and breach of contract.

## THE PARTIES

13.     Plaintiff is a natural person and a resident of Texas.

14.     Defendant CU Boulder is part of the University of Colorado system, with its principal administrative offices in Denver, Colorado. CU Boulder is authorized, supervised and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes.

15.     Defendant Dr. Philip DiStefano ("DiStefano") is a natural person and, upon information and belief, a resident of Colorado. DiStefano is the Chancellor of CU Boulder. He was responsible for implementing the policies and procedures pursuant to which the investigation against Mr. Norris was to be carried out and for hiring CU Boulder's Title IX coordinator Valerie

Simons. Mr. DiStefano is also the University official charged with the disclosure of student education records to third party requestors.[3]

## JURISDICTION AND VENUE

16.    This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

17.    This Court has personal jurisdiction over Defendant CU Boulder on the ground that it is conducting business within the State of Colorado.

18.    This Court has personal jurisdiction over Defendant DiStefano on the ground that he was employed by CU Boulder at all times relevant herein and personally acted within the State of Colorado and the District of Colorado.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    CU Boulder Faces Federal and Local Pressure to Comply with Title IX

19.    On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of

---

[3] *See Doe v. DiStefano*, No. 16-cv-1789-WJM-KLM (denying motion to dismiss procedural due process claim against DiStefano).

1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

20.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/ story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

21.     The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

22.     On May 16, 2013, a female student at CU Boulder filed a complaint with OCR claiming that the school violated Title IX by failing to issue a severe enough sanction against a male respondent who was found responsible for sexual assault. The complaint was widely publicized, with the female student stating that she was forced to "do the dirty work that the university couldn't do." Shortly thereafter, OCR opened an investigation at CU Boulder.[4] Local press noted that OCR had the power to "refer the case to the Department of Justice for prosecution or seek to block federal funding for the university."

23.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

24.     In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated

---

[4]  The OCR investigation was not closed until September 2017, or fifteen months after Plaintiff was suspended from CU Boulder.

trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual assault.

25.     On May 1, 2014, the DOE issued a press release naming CU Boulder as one of the initial 55 colleges and universities being investigated for violating Title IX. Then Assistant Secretary of Education Catherine Llhamon ("Llhamon") stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "[r]eleasing this list advances a key goal of President Obama's White House Task Force to Prevent Students from Sexual Assault…. The Obama Administration is committed to putting an end to sexual violence—particularly on college campuses." "All universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action."

26.     On May 1, 2014, Chancellor DiStefano issued a letter to the campus, acknowledging the OCR's public disclosure of the investigation of CU Boulder and outlined the

University's efforts to comply with Title IX since the opening of the investigation. DiStefano also referenced the White House's *Not Alone* report and noted "I am aware that many of our students are circulating a petition asking for us to form a task force…to implement the White House's recommendations…I pledge to you that we will review all the White House recommendations and integrate those elements into what we are currently doing, all with the goal to move us beyond mere compliance, into leadership."

27.     On May 1, 2014, the *CU Independent*, the campus newspaper, addressed the OCR announcement that CU Boulder was under investigation, noting "CU Boulder has come under fire for claims related to sexual assault multiple times in the last year."

28.     On May 10, 2014, local press report that CU Boulder settled the "sexual assault case that sparked Title IX investigation" with the female complainant. The female complainant went on record stating that the University needed to change its policies "for all future survivors so the campus is a lot safer for them and the policies really cater towards survivors' needs." In response, a University spokesperson publicly declared that CU Boulder was committed to complying with and exceeding Title IX requirements.

29.     In June 2014, Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

30.     On June 12, 2014, Chancellor DiStefano announced that the University had hired "education and civil rights lawyer" Valerie Simons ("Simons") to serve as Title IX Coordinator for the campus. The article lauded Simons' previous position working for the United States

Department of Justice, including a case "which involved the admission and integration of women at [a] formerly all-male state university."

31.    On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

32.    During the Fall 2014 semester, CU Boulder's Title IX staff attended training sessions which focused on "trauma informed interviewing." These training sessions were provided on a continuing basis going forward.[5]

---

[5] According to a website affiliated with trauma-informed "expert" Claire K. Hall, J.D., who offers just one of dozens of trauma-informed training courses across the country, "Trauma-informed investigations have been shown to significantly strengthen a victim's account of incidents, to create a more supportive environment and to result in a greater likelihood of holding responsible offenders accountable[.]" *See* https://www.paper-clip.com/Main/Product-Catalog/TraumaInformed-Sexual-Assault-Investigations-Train-2918.aspx. A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event. According to proponents of the trauma-informed approach, "the stress associated with trauma makes it nearly impossible for the brain to accurately recall all the details of a sexual assault." *Trauma-Informed Sexual Assault Investigations Training Binder*, 2016 (available at https://www.trauma-informed-investigations.com/sites/trauma-informed-investigations.com/files/Trauma-Informed-Training-Samples.pdf). Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma.

33.     In October 2014, two CU Boulder administrators gave a presentation at a conference organized by ATIXA, or the Association of Title IX Administrators, in which they asserted that "no one person in an institution can meet all the requirements for meaningful prevention efforts and fair, coordinated responses to reports of sexual violence and harassment." The presentation discussed the collaborative relationship between CU Boulder's Office of Student Conduct and Office of Victim Assistance, noting "[a] collaborative relationship between victim services and conduct investigators is important for both the survivors and the campus."

34.     In January 2015, CU Boulder held a "sexual misconduct town hall" called "It's On Us," named for the national "anti-sexual assault campaign."[6] A focus of the meeting was the CU Boulder Police Department's shift in policies, to put "the survivor back in the driver's seat." Administrators at the meeting confirmed that campus institutions were "working hard to make the process as survivor-focused as possible."

35.     In February 2016, the *CU Independent* published an opinion piece which criticized CU Boulder for administering lax punishments in sexual misconduct cases and fostering a "rape culture…which…teaches young men that drunken hookups are a space of free reign where anything goes."

36.     On April 8, 2016, former Vice President Biden delivered a speech to the CU Boulder campus as part of the "It's On Us Week of Action." In preparation for the visit, Chancellor DiStefano and Title IX Coordinator Simons appeared in an "It's On Us" video. DiStefano

---

Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility.

[6] The national It's On Us website prominently features statistics about female sexual assault victims, including "female students are 4X as likely to be victims of sexual assault than males." Also included on the website are videos portraying men as rapists. http://www.itsonus.org/

announced that "[w]e share the same goals as the Vice President…. The campaign is part of our comprehensive education and prevention initiatives to combat sexual violence and it complements our overall efforts during the past two years to become a national model in this area."

37.     In his April 8th speech, Vice President Biden focused on protecting women from sexual assault, discussing the faulty 1 in 5 statistic and stating "whether you're already in bed with him and you change your mind, No means no!" Biden further advised men on campus to "[l]ook in the mirror and ask, are you being the man you think you are?" The speech was described by the CU Boulder Alumni Association as a "test of character." CU Boulder's Office of Government Relations also wrote about the visit in its Government Relations Newsletter.

## II.     Mr. Norris' Unblemished Academic and Disciplinary Record

38.     Prior to the University's imposition of the unwarranted sanction of suspension against Mr. Norris, he was preparing to complete his final six credits at CU Boulder. Upon graduation, he was committed to joining the United States Air Force as a Lieutenant and pursuing a military career.

39.     During his four years at CU Boulder, Mr. Norris maintained a 3.5 GPA as a major in mechanical engineering and was an exemplary ROTC cadet. Prior to the University's investigation of Jane Roe's false allegations against him, Mr. Norris was in good standing at CU Boulder, had no prior disciplinary record and was well positioned in his ROTC program.

## III.     CU Boulder's Policies and Contract With Plaintiff

40.     Upon his acceptance to CU Boulder, Plaintiff was provided with online access to copies of the University's Office of Student Conduct's "Student Conduct Code Policies and Procedures," (the "Student Conduct Code") which set forth the definitions and procedures pursuant

to which allegations of sexual misconduct were investigated and students accused of violating the Code were, possibly, disciplined. The Student Conduct Code was updated for the 2013-2014 academic year, the time period relevant to Jane Roe's allegations against Plaintiff.[7]

41.     The Student Conduct Code, in relevant part, defined "non-consensual sexual contact" as:

> Any intentional sexual touching, however slight, with any object, by any person upon another person, that is without consent and/or by force. Sexual contact includes intentional contact with the breasts, buttocks, groin, or genitals, or touching another with any of these body parts, or making another touch you or themselves with or on any of these body parts; or any other intentional bodily contact in a sexual manner. App. 1, § A.

42.     The Student Conduct Code defines "consent" as:

> [c]lear, knowing, and voluntary words or actions which create mutually understandable clear permission regarding willingness to engage in, and the conditions of, sexual activity. Consent must be active; silence by itself cannot be interpreted as consent.
>
> ….
>
> Consent will be determined using both objective and subjective standards. The objective standard is met when a reasonable person would consider the words or actions of the parties to have manifested an agreement between them to do the same thing, in the same way at the same time, with another. The subjective standards [*sic*] when a party believes in good faith that the words or actions of the parties manifested an agreement between them to do the same thing, in the same way, at the same time, with one another. App. 1 § B.

43.     The Student Conduct Code provides that:

> All reports or complaints should be made as promptly as feasible after the occurrence. A delay in reporting may be reasonable under some circumstances, as determined on a case-by-case basis. An unreasonable delay in reporting, however, is an appropriate consideration in evaluating the merits of a complaint. App. 1 § D.2.

---

[7] All referenced herein to the Code are to the 2013-2014 version.

44.     The Student Conduct Code implemented a "preponderance of information" standard for evaluating complaints, or that "it is more likely than not that the student violated the Student Conduct Code." § H.4.

45.     Students who provided false information to any university official during the conduct process could be charged with violating the Code. App. 1 § D.12.

46.     In cases where the University imposed a sanction of suspension or expulsion, the student was permitted to appeal the decision. Appeals were decided by a three-person Student Conduct Appeal Committee with broad authority to reverse the University's finding and reduce any sanction. Code, § K.2.

47.     In August 2014, under the direction of Defendant DiStefano, CU Boulder's Office of Institutional Equity and Compliance ("OIEC") was created, and CU Boulder implemented the OIEC Process and Procedures which were to govern sexual misconduct cases going forward and replaced the Student Conduct Code as related to sexual misconduct. The Code remained in place for other student conduct violations. The OIEC Process and Procedures were made available to University students, including Mr. Norris, online. The 2015-2016 OIEC Process and Procedures, which the OIEC wrongfully applied in Plaintiff's case provide, in relevant part:

(i)      "The Process and Procedures govern all students." § C.1.

(ii)     "There is no statute of limitations for OIEC matters. The date of the alleged incident will determine which Process and Procedures (or applicable Student Code of Conduct) will apply." § C.2.

(iii)    "Even if a *victim* chooses not to report formally and/or chooses not to participate in an investigation process… the victim can contact the OIEC for information and assistance accessing…support services." § C.1 (emphasis added).

(iv)     "The University is committed to providing prompt, fair, impartial and equitable investigation and resolution of any complaint that the University knows, or in the exercise of reasonable care, should have known about." § H.

(v)      Prior to notifying a respondent that a report has been made, the University may conduct a "preliminary inquiry" into the allegations. § H.1.

(vi)     Remedial measures such as "no-contact orders enforced by the University" will not disproportionately impact the *complainant*. § H.2. (emphasis added).

(vii)    "Investigations will be conducted by staff who are appropriately trained and have qualifications and experience that will facilitate a prompt, fair, equitable and impartial investigation." § H.4.

(viii)   "If a formal investigation is commenced, the OIEC shall send the respondent and complainant a Notice of Investigation which will…[r]equire that the respondent contact the OIEC **within three (3) days** to set up a meeting." (emphasis in original).

(ix)     If the respondent does not "schedule or attend an interview by the date specified in the Notice of Investigation…the OIEC may complete the investigation based on the totality of the information." § H.6.a.i.

(x)      "The OIEC follows an investigative model…[t]here are no formal hearings." § H.6.a.ii. In contrast, the University's Student Conduct Code for 2013-2014 and, upon information and belief, 2015-2016 permitted a hearing for students accused of far less serious residence hall violations.

(xi)     "The University will use its best efforts to complete its investigation and impose sanctions **within sixty (60) days** of the issuance of a Notice of Investigation." § H.6.a.vii. (emphasis in original).

(xii)    There is no process through which respondents can question the complainant or other witnesses, in order to test credibility or for purposes of cross-examination. In contrast, the Student Conduct Codes for 2013-2014 and 2015-2016 permitted students accused of Code violations other than sexual misconduct to submit written questions to the presiding conduct officer to be asked of the complainant and witnesses.

(xiii)   "At the conclusion of an investigation…the investigators shall prepare a written Investigative Report that will include a statement of factual findings and a determination as to whether or not there was a violation." § H.6.a.iv. The applicable standard of proof required for a finding of responsibility is "a preponderance of

evidence, *i.e.*, the information gathered demonstrates that it is 'more likely than not' that the conduct occurred." § H.6.c.

(xiv)    The Investigative Report "shall be presented for review to the Standing Review Committee [which] shall consist of employees who have receive appropriate training regarding implementation and application of the Process and Procedures. The Standing Review Committee reviews the Investigative Report…for bias and impartiality, thoroughness of the investigation and sufficiency to support the finding." § H.6.a.v. The Standing Review Committee may not conduct its own investigation or hearing. Respondents are provided with no information about the number of committee members, the composition of the committee, or when the committee receives the Investigative Report for review. Respondents have no opportunity to challenge the committee members.

(xv)    "The OIEC shall advise the complainant and respondent simultaneously in writing of the result or outcome of any investigation…. A copy of the investigator's final Investigative Report as approved by the Standing Review Committee shall be provided to the complainant, the respondent, the Chancellor and …the Vice Chancellor for Student Affairs." § H.6.a.vi.

(xvi)    "The Executive Director or designee is authorized to impose sanctions for student respondents." § H.6.f.

(xvii)    "The OIEC investigation report and sanction if applicable are final and there are no separate appeal procedures." § H.6.g.

(xviii)    "In all cases, the OIEC shall retain the investigator's report and final sanction for a minimum of three years or for as long as any administrative or legal action arising out of the complaint is pending." § H.8.

48.    The 2015-2016 OIEC Process and Procedures outline the conflicting roles of the Title IX Coordinator, Simons. § I. The Title IX Coordinator:

(i)    also serves as the OIEC Director;

(ii)    is responsible for "ensuring that complaints and any subsequent disciplinary actions are being handled appropriately and in a timely manner;"

(iii)    oversees "adequate, reliable and impartial investigations of complaints of misconduct;"

    (iv)     provides an annual report to Chancellor DiStefano documenting: "(1) the number of reports or complaints of violations of th[e] policy; (2) the categories…of parties involved; (3) the number of policy violations found; and (4) examples of sanctions imposed for policy violations;"

    (v)     oversees and monitors "campus compliance" with the OIEC policy; and

    (vi)    ensures that there is "ongoing training and education regarding reporting and preventing sexual misconduct for all students, faculty and staff." *Id.*

49.     Simons also conducted an "administrative review" in Plaintiff's case. In doing so she relied on the 2016-2017 OIEC Process and Procedures, which provide, in relevant part:

The OIEC Executive Director or designee has the authority and discretion to review and take any appropriate action deemed necessary, including re-opening an investigation, if…the Process and Procedures set forth herein were not followed; or (3) additional circumstances warrant it. § C.5.

50.     The 2016-2017 OIEC Process and Procedures further provide:

The University has an obligation and jurisdiction to conduct at least a preliminary inquiry to determine whether the conduct occurred in the context of, or had continuing effects on, a University program, activity or employment. § H.1.

## IV.   The Relationship Between Plaintiff and Jane Roe

51.     Plaintiff and Jane Roe became friends during the 2013-2014 academic year, when Plaintiff was a sophomore and Jane Roe a first-year student.

52.     One night during the Spring 2014 semester, Jane Roe attended a party at Plaintiff's off-campus residence, where both of them were drinking a fair amount and were tipsy. The party progressed late into the night and Plaintiff's housemates started going to bed. Plaintiff and Jane Roe began kissing and then moved into his bedroom where they continued to kiss. The two moved to his bed and began to playfully wrestle during which Plaintiff pinned Jane Roe's arms over her head. During this interaction, Plaintiff moved his hand down Jane Roe's body towards her genitals

when Jane Roe said "no." Plaintiff respected Jane Roe's wishes and stopped the interaction. The two continued to kiss and talk for the rest of the night. Jane Roe slept over Plaintiff's house and left at approximately 6:00 a.m.

53.     During the remainder of the Spring 2014 semester, and into the summer, the two would frequently "make out." Often times, either Jane Roe or Plaintiff would progress the interaction towards genital contact and then they would stop the interaction at that point. Plaintiff and Jane Roe continued to have a friendship over the course of the next year and a half and also continued to make out. Jane Roe told people in their circle of friends that she was in love with Plaintiff.

54.     In July 2015, the Plaintiff and Jane Roe briefly engaged in sexual intercourse—initiated by Jane Roe—which Plaintiff stopped because he felt guilty about cheating on his girlfriend at the time, who was also Jane Roe's close friend. The two spoke about the encounter the next day and Plaintiff was shocked because Jane Roe claimed not to remember the encounter. During their time together the night before, Plaintiff saw no indication that Jane Roe was intoxicated—he was familiar with the signs because he had spent many nights during their friendship caring for her when she was drunk.

55.     Plaintiff and Jane Roe then had an hour-long discussion about what happened, including about Plaintiff's relationship with his girlfriend. Plaintiff encouraged Jane Roe to take Plan B as a precaution, even though the intercourse had been interrupted. After this conversation, Jane Roe stopped speaking to Plaintiff and his girlfriend. Plaintiff assumed it was because she was upset about losing her close friend as a result of their decision to engage in sexual intercourse.

56.    Plaintiff did not hear from Jane Roe again until January 18, 2016 when she asked to meet with him. At the meeting, Jane Roe accused Plaintiff of rape, referring to their July 2015 encounter. Plaintiff was shocked and concerned. He went home and told his friend, "W8," about the meeting. W8 expressed shock and disbelief.

## V.    Jane Roe's University Complaint Against Plaintiff

### A.  The OIEC Investigation

57.    On or about January 20, 2016, Jane Roe filed a report with the BPD, which commenced a criminal investigation into Jane Roe's allegations that she was sexually assaulted in July 2015 and that, in Spring 2014, Plaintiff touched her genitals without her consent.[8]

58.    On January 20, 2016, the OIEC received a call from a CU Boulder employee stating that Jane Roe had filed a complaint with BPD against Plaintiff.

59.    On or about January 20, 2016, OIEC assigned Lauren Hasselbacher ("Hasselbacher") to investigate Jane Roe's allegations against Plaintiff. Hasselbacher had a conflict of interest because her job included ensuring that CU Boulder's policies and procedures complied with Title IX. She also worked closely with CU Boulder's Office of Victim Assistance. Hasselbacher, further, has a background in women's studies, extensive experience as an advocate for women who have experienced domestic violence and sexual assault and also worked as a civil rights lawyer prior to joining CU Boulder.

---

[8] The criminal case against Mr. Norris was ultimately prosecuted and—after a six-day jury trial which concluded on October 19, 2017—the jury fully exonerated Mr. Norris, finding him *not guilty* of all charges.

60.     OIEC also assigned Tessa Walker ("Walker") to investigate Jane Roe's allegations against Plaintiff. Upon information and belief, Walker lacked experience with both Title IX and as an investigator, having worked only as a judicial law clerk prior to joining CU Boulder.

61.     Hasselbacher and Walker were charged with determining which evidence was relevant to Jane Roe's allegations, evaluating that evidence under the preponderance of the evidence standard, and determining whether Plaintiff violated the 2013-2014 Student Conduct Codes.

62.     On January 21, 2016, Walker emailed Jane Roe and let her know that there were "no time limits on our side, so if at any point you would like to speak with me about the incident, I am available to meet or speak to you by phone." The email further informed Jane Roe that her participation in the process was optional and provided her with options for "advocacy and support."

63.     On January 26, 2016, BPD detective Beckjord notified Hasselbacher and Walker of the date and time for Jane Roe's interview. Beckjord welcomed them to observe the interview in real time. In response, Hasselbacher and Walker confirmed that they would both attend the interview, to which Beckjord responded "look forward to working with you," blurring the line between criminal investigation and college disciplinary process.

64.     Upon information and belief, on or about January 26, 2018, Detective Beckjord requested that OIEC refrain from serving a Notice of Investigation on Plaintiff until after he was interviewed by BPD. OIEC agreed to this request.

65.     On January 27, 2016, BPD interviewed Jane Roe. Hasselbacher and Walker observed her interview.

66.     On January 28, 2016, Plaintiff voluntarily appeared for a BPD interview with Detective Beckjord. Hasselbacher and Walker declined Beckjord's invitation to observe Plaintiff's interview at that time.

67.     After Plaintiff's BPD interview, on January 28, 2016, OIEC sent Plaintiff a Notice of Investigation, notifying him that "you may have violated the University of Colorado Boulder 2013-2014 Student Code of Conduct and/or the Sexual Misconduct Policy described in the 2015-2016 OIEC Process and Procedures."

68.     Per the Notice, Jane Roe's allegation that Plaintiff touched her genitals without her consent during the spring semester of 2014 were "being investigated under the Student Conduct Code, 2013-2014."

69.     Per the Notice, Jane Roe's allegation that Plaintiff sexually assaulted her in July 2015 was "being investigation [*sic*] under the 2015-2016 OIEC Process and Procedures." The sexual assault allegation is not at issue in this action because CU Boulder found Plaintiff "not responsible" with respect to this allegation.

70.     The Notice further advised "if you do not respond to this notice as directed, our office is authorized to make conclusions without your participation." The Notice gave Plaintiff two business days to find an advisor and to call and schedule a meeting with Hasselbacher and/or Walker. In contrast, Jane Roe was informed by investigators that her participation was optional and that she could confer with investigators at any time that was convenient for her.

71.     On January 29, 2016, Jane Roe called a meeting with all of her and Plaintiff's mutual friends, some of whom were named as witnesses in both the OIEC and BPD investigations. At the meeting, Jane Roe told their friends her account of what allegedly happened between her

and Plaintiff in Spring 2014 and July 2015, effectively tainting any recollection those individuals may have had about the events in question.

72.     On February 3, 2016, Plaintiff met with Hasselbacher and Walker to address Jane Roe's allegations and gave his account of his sexual encounter with Jane Roe in Spring 2014. His mother attended the meeting as his advisor.

73.     On February 8, 2016, Hasselbacher and Walker interviewed "W1" about the Spring 2014 allegation. Hasselbacher and also reviewed W1's statements to BPD.

74.     On February 9, 2016, Hasselbacher and Walker interviewed "W2" about the Spring 2014 allegation.[9] Hasselbacher and Walker also reviewed W2's statements to BPD.

75.     On February 15, 2016, Hasselbacher and Walker interviewed "W9" about the Spring 2014 allegation. Hasselbacher and Walker also reviewed W9's statements to BPD.

76.     On February 22, 2016, Plaintiff emailed OIEC and requested access to the investigative file. His request was denied.

77.     On February 23, 2016, Plaintiff again emailed OIEC and informed them that he would like to review the investigators' summary of his interview prior the issuance of any finding. He also asked that a copy be provided to his advisor. OIEC responded that it would inform Plaintiff when the fact gathering portion of the investigation was completed and stated that the office could not provide electronic copies of the investigation documents. Plaintiff was informed that he could review his statement in person at the OIEC office.

---

[9] W2 was treated as a key witness by Hasselbacher and Walker. Subsequent to Mr. Norris' suspension from CU Boulder, W2 apologized to Mr. Norris, admitted that she overreacted to Jane Roe's allegations and refused to further participate in any proceedings against Mr. Norris, stating she should not have been a part of the investigation in the first place.

78.   On February 25, 2016, Plaintiff requested a time to appear at the OIEC office to review his statement.

79.   On March 1, 2016, Hasselbacher and Walker met with Jane Roe to ask her follow up questions about her OIEC interview, as well as additional information obtained during the course of the investigation.

80.   On March 18, 2016, OIEC notified Plaintiff that he would be permitted to review the investigative file during the following week.

81.   On March 21, 2016, BPD interviewed Jane Roe for a second time.

82.   On March 21, 2016, Hasselbacher and Walker emailed Plaintiff to notify him that, on March 28, 2016, he would be allotted only two hours to review the investigative file. They also wanted to ask him follow-up questions after his review. They further informed him that they were drafting a written evidence summary to be issued the following week.

83.   On March 22, 2016 Plaintiff emailed the investigators to inform them that he believed that the process was unbalanced and unfair, particularly since they planned to issue the written evidence summary prior to his review of the investigative file and response to any follow up questions. Plaintiff asked for the investigators' follow-up questions to be provided in advance.

84.   On March 24, 2016, Hasselbacher and Walker viewed Plaintiff's recorded BPD interview, taken on January 28, 2016.

85.   On March 28, 2016, Plaintiff's counsel requested an opportunity to review the file during the first week in April. The OIEC then requested additional time to schedule the file review because then-Vice President Joe Biden was visiting the University on April 5-8.

86.     On April 1, 2016, prior to Plaintiff's review of the investigation file, or answering any follow-up questions, Hasselbacher and Walker issued the written evidence summary. Plaintiff had only 7 days to review and respond to the written evidence summary even though he had not been granted access to the investigative file due to Vice President Biden's visit.

87.     On April 1, 2016, Hasselbacher and Walker emailed the written evidence summary to Jane Roe, informing her that she should not share the document with anyone other than her advisor as sharing it with any witnesses or participants in the investigation could be viewed as retaliatory.

88.     On April 7, 2016, Jane Roe provided the written evidence summary to BPD, in violation of the investigators' directive. No action was taken by OIEC in this regard.

89.     On April 8, 2016 Vice President Biden delivered a speech to the CU Boulder campus as part of the "It's On Us Week of Action." Ahead of the event, Chancellor DiStefano and OIEC/Title IX Director Simons appeared in an "It's On Us" video to support the Vice President's visit. Biden's speech focused on female sexual assault victims. *See also supra* ¶¶ 36-37.

90.     On April 9, 2016, OIEC informed Plaintiff that he could review the investigative file on April 13, 2016. Plaintiff and his attorney conducted the file review but were limited to two hours. At all times an OIEC administrator was present during the file review, preventing Plaintiff from discussing the file contents with his attorney. Plaintiff and his attorney were also prohibited from making copies of any documents in the file.

91.     On April 18, 2016, BPD issued a second report concerning the investigation.

92.     On April 27, 2016, Hasselbacher and Walker emailed three questions to Plaintiff which were unrelated to the Spring 2014 allegation.

93.     On May 2, 2016, Hasselbacher and Walker issued an amended written evidence summary. At that point, Plaintiff had only been given two hours to review the investigative file.

94.     On May 5, 2016, Plaintiff's counsel objected to the OIEC investigation.

95.     On May 6, 2016, Plaintiff and his attorney conducted a second investigative file review which was again limited to two hours. Again, an OIEC administrator was present during the review, preventing Plaintiff and his attorney from discussing the file.

96.     On June 13, 2016, Hasselbacher emailed Plaintiff and informed him that, on the next day, the final investigative report would be reviewed by the "Standing Review Committee." Plaintiff was provided with no further information about the Committee.

97.     On June 14, 2016 the Standing Review Committee purportedly reviewed the evidence file and the 55-page Confidential Final Report and approved the finding, taking less than a full day to do so. The Confidential Final Report was issued the same day. The Committee review was no more than a rubber stamp, as opposed to the thorough review required by both the Student Conduct Code and 2015-2016 OIEC Process and Procedures.

98.     Upon information and belief, the members of the Standing Review Committee who were assigned to Plaintiff's case did not receive "appropriate training," as required under both the Student Conduct Code and 2015-2016 OIEC Process and Procedures.

**B.   The Erroneous Finding**

99.     The Confidential Final Report contained Hasselbacher's and Walker's subjective summary of the evidence they reviewed concerning Jane Roe's Spring 2014 allegation and their finding with respect to whether Plaintiff violated the 2013-2014 Student Conduct Code. Per the Confidential Report:

> Based on a review of the totality of the information gathered through this investigation and based on a preponderance of the information standard, the OIEC finds that Respondent violated provision F.4 Sexual Misconduct b) Non-consensual sexual contact of the **2014-2015 Student Code of Conduct**. (emphasis added).

The investigators' carelessness is evidenced by their reference to the wrong Student Conduct Code when finding Plaintiff responsible for non-consensual contact—he was "charged" under the 2013-2014 Student Conduct Code.

100.    There was also insufficient evidence to support the finding—whether under the 2013-2014 Student Conduct Code's "preponderance of the information" standard or the 2015-2016 OIEC Process and Procedures' "preponderance of the evidence" standard.

### 1.   The OIEC Investigators' Inaccurate Credibility Assessment

101.    Per the Confidential Final Report, the investigators found Plaintiff responsible because they believed that Jane Roe was more credible. The investigators incorrectly assessed Jane Roe as making consistent statements about the Spring 2014 allegation. They also incorrectly determined that Plaintiff made inconsistent statements.

102.    The evidence gathered by Walker and Hasselbacher demonstrated that Jane Roe provided inconsistent accounts of what happened to the BPD versus OIEC. At no point was she able to provide a clear account of what happened. Most significant was Jane Roe's inability to recall how the alleged incident ended. Hasselbacher and Walker did not ever ask the Complainant to give them her account of the Spring 2014 encounter. They instead asked her to respond to Plaintiff's statement.

103.     Per the evidence cited in the Confidential Final Report, Jane Roe made inconsistent

statements about:

  i.     Where she was prior to attending the party where she met up with Plaintiff on the
         night in question.

  ii.    The conversation, if any that she had with Plaintiff before they engaged in
         consensual kissing.

  iii.   Her state of undress.

  iv.    What exactly occurred after consensual kissing: Jane Roe first told BPD
         investigators that Plaintiff pinned her down and stuck his hand down her pants. Later
         in the same interview she said she could not remember if Plaintiff made contact with
         her intimate parts. She confirmed this in the second BPD interview. It was not until
         she was prompted by the BPD investigator, who asked her leading questions, that
         Jane Roe stated that Plaintiff touched her private parts. The Confidential Final
         Report fails to mention this, instead juxtaposing two contradictory statements from
         Jane Roe's second interview: i) "I asked [Complainant] if [Respondent] touched her
         intimate parts.  She said she could not remember how far he got;" and ii) "[s]he
         remembered his hand under her underwear." Jane Roe's latter, contradictory
         statement should not have been considered by the OIEC investigators. They did
         nothing to clarify Jane Roe's misstatements.

  v.     Jane Roe told the BPD during her first interview that she used a martial arts
         maneuver to try to free her hands after Plaintiff allegedly pinned them over her head.
         She could not, however, remember how the alleged incident ended. In the second
         BPD interview she made no mention of the maneuver but stated that she did not
         remember how she got out of the situation. Jane Roe told the OIEC that she was
         quiet during the incident but then described fighting Plaintiff off and breaking his
         hold on her arms.

         No statement made by Jane Roe in any context provided a consistent account about
         what happened after Plaintiff allegedly pinned her down. In one instance, she did
         not remember what happened in Spring 2014 and surmised that Plaintiff became
         disinterested and released his alleged hold on her arms. In the other, Jane Roe
         described various scenarios, including the use of martial arts, in which she allegedly
         fought off Plaintiff.  These scenarios completely contradict one another and should
         have led to a finding that Jane Roe's account of what happened in the Spring of 2014
         was not credible.

  vi.    Whether Jane Roe spoke with Mr. Norris about the Spring 2014 incident.

vii.   Whom she spoke to about the alleged incident: In her January 27, 2016 interview with the BPD, Jane Roe stated that she kept the incident quiet and did not report it to law enforcement. She later stated in the same interview that on the night in question she immediately phoned her friend, "JG." OIEC investigators observed this interview, but never questioned JG. Nor did they seek Jane Roe's phone records, to verify the time and date of the purported call to JG and to pin down the date of the alleged event. In subsequent statements to BPD, Jane Roe gave additional details about the conversation she purportedly had with JG on the night of the alleged incident with Plaintiff. [10]

After the first BPD interview in which Jane Roe stated that she called JG, Jane Roe was interviewed by OIEC investigators. She did not mention JG. Instead, she told OIEC investigators that, months later, she told her friend, W1, about the alleged incident. The OIEC investigators never questioned Jane Roe about the discrepancy in her account to BPD versus OIEC, or why she did not tell them about JG. The OIEC investigators also never noted, or followed up on, the fact that during her second interview with BPD Jane Roe said that the only person she told about the Spring 2014 allegation was W1. This was inconsistent with her first BPD interview in which she stated that she only told JG.

104.   There were significant inconsistencies in the accounts told by the witnesses who were interviewed by Walker and Hasselbacher.[11] Rather than viewing these inconsistencies as undermining the Jane Roe's credibility, Walker and Hasselbacher "resolved" them by permitting Jane Roe to explain them away:

i.   W1's account conflicted with Jane Roe's statements and made little sense. Per the Confidential Final Report, W1 told the OIEC investigators that Roe told W1 that Plaintiff assaulted her every time she was drunk. W1 could not remember the specifics of what Jane Roe actually said other than the fact that she told her it had happened on multiple occasions. W1's faulty recollection, alone, should have discredited her as a witness. W1's statement was also inconsistent with Jane Roe's statements to OIEC investigators and BPD because Jane Roe told the investigators that Plaintiff had assaulted her only one time prior to the July 2015 incident. OIEC investigators improperly looked to Jane Roe to resolve the discrepancy between W1's and her own account. When asked about W1's statement, Roe dismissed it as

---

[10] At trial, when confronted with her phone records for that night, Jane Roe admitted that she never called and spoke to JG about the alleged incident with Plaintiff.
[11] Notably, there were no immediate outcry witnesses.

W1 being protective of her which "set the tone" for how W1 heard the conversation. The OIEC investigators should not have relied on pure speculation to resolve the significant discrepancy between W1's and Jane Roe's accounts of what Roe's "outcry" statement to W1 actually was.

With respect to the Spring 2014 allegation, W1 reported that Jane Roe told her that she ran out of the room after the alleged incident. This contradicted Jane Roe's several accounts to BPD that she did not recall how the incident ended. Thus, the credibility of W1's statement concerning the alleged incident should have been questioned by OIEC investigators—it was not.

ii.   W2[12] told the OIEC investigators that she *could not remember* specifically what Jane Roe told her about what happened in Spring 2014 and that the conversation happened a long time ago. Yet somehow,[13] W2 recalled Roe telling her that Plaintiff tried to rip her pants down, and, in W2's opinion, Roe "obviously" did not want him to do that. W2 also told the OIEC investigators that Roe said she did not like Plaintiff and that he was too aggressive and sexually forward. This flatly contradicted Roe's numerous statements that she was close friends with Plaintiff, including for at least 18 months after the Spring 2014 incident. W2's statement that Plaintiff tried to rip Roe's pants down also contradicts Roe's unsupported allegation that Plaintiff tried to put his hand down her pants.

The OIEC investigators should have discredited W2's testimony. Instead, they construed W2's statements as facts supporting Roe's account of what happened to find that it was more likely than not that Roe's "recollection of events occurred as she asserted."

iii.  W9's account of what Jane Roe told him about the Spring 2014 allegation was inconsistent with Roe's account to the BPD and OIEC investigators. W9 also made inconsistent statements of his own to the BPD and OIEC investigators, directly contradicting the OIEC investigators' conclusion that W9 "provided materially consistent information to the BPD. W9 told the OIEC that "*W1*[14] had previously told him that Plaintiff had sexually assaulted her multiple times when he was intoxicated." (emphasis added). W9 previously told the BPD that *Jane Roe* told him

---

[12] At around the time that Plaintiff was suspended from CU Boulder, W2 apologized to Plaintiff, admitted that she overreacted to Jane Roe's allegations and refused to further participate in any proceedings against Plaintiff, stating that she should not have been a part of the investigation in the first place.

[13] W2 was present at the meeting Jane Roe held with her and Plaintiff's mutual friends to tell her version of what allegedly happened. This meeting occurred before witness interviews took place.

[14] W1 and W9 were dating at the time.

that, beginning in the Spring of 2014, Respondent "started to assault her. It happened multiple times, pinned her down and forced her to kiss him, groped her. And that [Complainant] had to, on multiple occasions, break away from that, get away from him. She then told him no every single time." W9's account is entirely inconsistent with Roe's statements to the BPD and OIEC that only one incident allegedly occurred in Spring 2014, that she was not sure how the Spring 2014 encounter ended, that she and Plaintiff were good friends for at least 18 months after the alleged incident, and that she was in love with Plaintiff.

105.    In contrast to the purported "consistency" in Jane Roe's statements, Hasselbacher and Walker erroneously concluded that Plaintiff's statements to the BPD on January 28, 2016 were inconsistent with statements made in his OIEC interview, which was conducted on February 3, 2016. Hasselbacher and Walker found that these fabricated inconsistencies undermined Plaintiff's credibility.

106.    According to the Confidential Final Report, Plaintiff's credibility was undermined by the fact that he "told BPD that he did not know what Complainant was referring to" and "in meeting with the OIEC…[he] stated he knew which encounter Complainant was referring to and that he remembered 'exactly what happened.'"

107.    The investigators ignored that, at the time of the BPD interview, Plaintiff had not yet received the Notice of Investigation; consequently, he was not aware of what Jane Roe actually alleged, or the relevant timeframe, until after he received the Notice.

108.    They further ignored that, during the earlier BPD interview, Detective Beckjord asked Plaintiff to answer questions about the Spring 2014 incident which had no factual basis. The allegations Beckjord stated during the interview resembled no encounter that had ever occurred between Plaintiff and Jane Roe—or that Jane Roe had even described to the detective prior to

Plaintiff's interview—and Plaintiff accurately answered that he had no knowledge of such an encounter.

109. BPD presented Plaintiff with a false account of the Spring 2014 allegation and Plaintiff appropriately—and credibly—denied that it ever happened. Upon information and belief, Hasselbacher and Walker failed to carefully review the BPD interview with Mr. Norris and, as a result, they mischaracterized his statements to the BPD to fit their preconceived hypothesis that he lacked credibility.

110. Subsequent to his interview with BPD, Plaintiff received the OIEC's Notice of Investigation,[15] which provided him with a date reference for the alleged occurrence, and a description of the event, which *excluded* any reference to the false version of events that Beckjord presented to Plaintiff. When interviewed by Hasselbacher and Walker on February 3, 2016, Plaintiff was able to provide a detailed account of his Spring 2014 encounter with Jane Roe because he was now aware of the relevant timeframe and was able to recall the event.

111. The Confidential Final Report also *supports* the credibility of Plaintiff's prior statement to the BPD. During his interview on February 3rd, Plaintiff told Hasselbacher and Walker that the BPD provided him with a differing, and *incorrect*, account of the Spring 2014 allegations: "Respondent stated that he was confronted by police about the assault charge, and there were details that Complainant provided to police that were not true. Respondent said that Complainant stated to the police that she had kicked him off of her and ran out of the room, which is 'absolutely

---

[15] Detective Beckjord of BPD asked the OIEC investigators not to provide the Notice of Investigation to Plaintiff until after his BPD interview. They complied with his request. OIEC's withholding of information concerning the allegations against him, coupled with Detective Beckjord's gross mischaracterization of Jane Roe's actual allegations when questioning Plaintiff is what caused Plaintiff's initial confusion about the alleged incident. This is an egregious example of OIEC and BPD conspiring together to achieve predetermined results in their investigation.

untrue.'" Thus, Mr. Norris was consistent in his account, despite being subjected to inconsistent, and inaccurate, lines of questioning.

112.    On the record, Jane Roe's account of what happened—to investigators and witnesses alike—was vague, contradictory and inconsistent and certainly did not support a violation of the Student Conduct Code.

113.    Hasselbacher and Walker ignored glaring errors, inconsistencies and faulty memories to piece together a version of facts that favored Jane Roe. They further permitted Roe to clear up consistencies in witness statements so that they could patch together a "consistent" theory of what occurred.

114.    Given that CU Boulder was under OCR investigation at the time of the investigation, was under the scrutiny of Vice President Biden and had been widely criticized for not protecting female sexual assault victims, Hasselbacher and Walker were, upon information and belief, under pressure to ensure that Plaintiff be found responsible for violating the Student Conduct Code, in order to appease Jane Roe and maintain CU Boulder's public commitment to protecting female victims of sexual assault.

115.    Hasselbacher and Walker did not question Jane Roe's credibility because, upon information and belief, CU Boulder trained them to take a trauma-informed approach in which female complainants are presumed to be telling the truth and difficult or sensitive questions are avoided.

116.    Upon information and belief, Ms. Hasselbacher's past experience as a women's advocate caused her to view the evidence through a gender-biased lens. It is also highly probable

that as senior investigator, Hasselbacher swayed the inexperienced Walker to see things her way, at Plaintiff's expense.

### 2.   The OIEC Investigators' Misstatements of Fact

117.   Hasselbacher's and Walker's finding that Mr. Norris was responsible for non-consensual sexual contact under the 2013-2014 Student Conduct Code was grounded in several misstatements of fact:

    i.    The investigators found that Plaintiff "opened" and "unbuttoned" Jane Roe's pants and touched her genital area. However, in Jane Roe's January 27, 2016 BPD interview—observed by Hasselbacher and Walker—she stated that she did not believe Plaintiff unbuttoned her jeans. The Confidential Final Report states that Jane Roe did not remember if Plaintiff successfully unbuttoned her pants, only that he attempted to do so.

    ii.    The investigators found that Plaintiff touched Jane Roe's genital area under her underwear with his hand. However, Jane Roe did not recall if Plaintiff made contact with her genitals.

    iii.    The investigators found that Jane Roe physically resisted Plaintiff. Jane Roe reported in her January 27, 2016 BPD interview that she did not say anything to him. She also stated that she did not remember how she was able to remove herself from the situation and that she didn't know if Plaintiff just became disinterested.

    iv.    The investigators found that Plaintiff was too intoxicated to be fully aware of Jane Roe's resistance or the extent of force he was using. There was no evidence that Plaintiff was too intoxicated to be aware of what was happening. On the contrary, Jane Roe reported that she and Plaintiff were having a heart to heart conversation moments before the alleged incident.[16]

118.   Jane Roe's account of the events surrounding the Spring 2014 allegation contradicts the factual "findings" made by Hasselbacher and Walker. There was simply no rational basis for

---

[16] In statements that post-date the OIEC investigation, Jane Roe reported that Plaintiff was communicating clearly with her just moments before their encounter.

the investigators to conclude that it was more likely than not that non-consensual sexual contact occurred under the Student Conduct Code.

119.    On June 13, 2016, Hasselbacher and Walker emailed a Notice of Finding to Plaintiff. Like the Confidential Final Report, the Notice referred to the incorrect Student Conduct Code, stating that Plaintiff was found responsible for non-consensual sexual contact under the "2014-2015 Student Code of Conduct." The Notice also stated "[t]he findings have been reviewed and approved by a review committee."

120.    The Notice of Finding informed Plaintiff that CU Boulder's Title IX Coordinator and Executive Director, Simons, would determine the sanction.

### C.  The Unwarranted and Severely Disproportionate Sanction

121.    On June 30, 2016, Simons emailed Plaintiff a Notice of Sanction, which again referenced the wrong Student Code of Conduct—indicating that Simons was unaware of which Code applied because she failed to conduct an adequate review "of the investigative report and all relevant information available to [her]" as stated in the Notice of Sanction.

122.    Simons was solely responsible for determining the sanction.

123.    In her role as the OIEC's Executive Director and CU Boulder's Title IX Coordinator, Simons had a conflict of interest which should have precluded her from deciding Plaintiff's case or any other sexual misconduct case. Simons' responsibilities included ensuring CU Boulder's compliance with Title IX, and she worked closely with the OCR during the course of its investigation of the University's failure to take action to support female sexual assault victims. Simons was a public voice against sexual assault, handpicked by Chancellor DiStefano in response to the OCR investigation. Simons participated in the "It's On Us" video for Vice

President Biden's visit during the time in which Jane Roe's complaint was investigated. She was also responsible for compiling statistics for sexual misconduct complaints, including examples of the sanctions issued, and reporting to Chancellor DiStefano. These responsibilities gave rise to a potential for bias in determining the sanction in Plaintiff's case.

124.    The OCR warned against conflicts of interest in the April 2011 Dear Colleague Letter "Title IX Coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest." DCL at 7. Simons was akin to a disciplinary hearing board member because she was responsible for determining the outcome of Plaintiff's case.

125.    Simons also publicly supported women's advocacy groups during the timeframe in which Jane Roe's allegations against Plaintiff were investigated. For example, she gave a Title IX presentation for the American Association of University Women, an organization which "advances equity for women and girls through advocacy." Upon information and belief, Simons' work as an education attorney prior to joining CU Boulder primarily involved advocacy for female students. Upon information and belief, Simons background as a civil rights attorney also caused her to take an adversarial rather than inquisitorial view of CU Boulder's sexual misconduct process.

126.    As a result, Simons issued an unwarranted and unduly severe sanction which: i) suspended Plaintiff for 18 months; ii) banned Plaintiff from campus; iii) required him to undergo "an evaluation and treatment from a licensed sex offender provider;" iv) required proof of any court-ordered or other sanctions; v) required that any application for readmission be personally approved by Simons; and vi) contained a no contact order prohibiting contact with Jane Roe.

127. The Notice of Sanction did not notify Plaintiff of any right to appeal, even though the Student Conduct Code permitted an appeal or the right to seek an appeal. Code, § K. The 2015-2016 OIEC Procedures, which were improperly applied to Plaintiff's case, did not permit an appeal in sexual misconduct cases even though appeals were allowed in cases involving other violations.

128. On August 18, 2016, Plaintiff submitted a Statement of Appeal on the grounds that: i) the established procedures were not followed in a significant way and, as a result, the factual findings and the sanction, were not correct and ii) the severity of the sanction was not appropriate based on the circumstances.

129. On August 31, 2016, Simons notified Plaintiff that she would be conducting an "administrative review" of Plaintiff's appeal pursuant to the 2016-2017 OIEC Process and Procedures. She further stated that she would singularly conduct a "preliminary inquiry" into Plaintiff's allegations of gender bias as if he had lodged a University complaint.

130. Had the appeal been granted pursuant to the Student Conduct Code applicable to the Spring 2014 allegation, then it would have been reviewed by an appeal committee rather than once again facing Simon's singular scrutiny.

131. Had Plaintiff been accused of any violation other than sexual misconduct he would also have had a right to an appeal, which would have been reviewed by an appeal committee under subsequent versions of the Student Conduct Code.

**D. The Sham Administrative Review**

132. In Plaintiff's case, Simons was responsible for issuing the sanction based on the Confidential Final Report and finding. She then tasked herself with conducting an "administrative review" of her own decision, raising serious questions about the fairness and impartiality of CU

Boulder's sexual misconduct process. As set forth *supra* Paragraphs 123-125, Simons had a conflict of interest as a decisionmaker in Plaintiff's case and was also, potentially, gender biased. The administrative review was a sham process. Moreover, only 3 people in total—Hasselbacher, Walker and Simons—were responsible for investigating and "adjudicating" the Spring 2014 allegation.

133.    Simons denied Plaintiff's appeal and failed to reverse the sanctions that she issued against him. The letter explaining the purported grounds for her decision demonstrated a misapprehension of the evidence in question, the procedures employed and meant to be employed, and bias in assuming that Plaintiff was less credible. For example:

    i.    Simons found that Hasselbacher and Walker were correct in finding that Plaintiff provided inconsistent accounts of what happened because there were "enough similarities in the lines of questioning" between the BPD and OIEC interviews that Plaintiff should have known what the allegations were. This ignored that the allegations Detective Beckjord presented to Plaintiff were fabricated and reflected no encounter that actually occurred between Plaintiff and Jane Roe at any point in time. While Simons seemed to criticize Plaintiff for "adamantly denying" the occurrence of the events presented by BPD, those allegations were simply inaccurate and Plaintiff appropriately denied them. At his OIEC interview, Plaintiff told Hasselbacher and Walker that BPD had presented him with inaccurate information but that he could speak to the allegations posed in the OIEC Notice of Investigation: "Respondent stated that he was confronted by police about the assault charge, and there were details that Complainant provided to police that were not true. Respondent said that Complainant stated to the police that she had kicked him off of her and ran out of the room, which is 'absolutely untrue.'" Plaintiff then proceeded to relay his account of the Spring 2014 encounter with Jane Roe.

    ii.    In response to Plaintiff's assertion that the OIEC misapplied the 2015-2016 OIEC Process and Procedures to his case—rather than the 2013-2014 Student Conduct Code—Simons stated a rule that does not appear in either the Code or the Process and Procedures. Per Simons:

> the procedural standards must necessarily be the ones currently in place…particularly as procedures are modified yearly to reflect evolving best practices and federal law. It is similar to a court setting where on must look to statutes or caselaw to determine if activity is

illegal in a civil or criminal context, but must look to the current rules of civil or criminal procedure to determine the process through which that determination is made.

Simons' explanation was patently false. The 2015-2016 OIEC Process and Procedures made no distinction between substantive policy definitions versus procedural rules, simply stating "the date of the alleged incident will determine which Process and Procedures (or applicable Student Code of Conduct) will apply." § C.2. Moreover, the 2015-2016 OIEC Process and Procedures—which denied respondents the right to an appeal—did not reflect best practices or federal law. The April 2011 Dear Colleague Letter recommended that universities have an appeal process in sexual misconduct cases, as did the 2014 Guidance.

iii.   With respect to the investigators' failure to account for Jane Roe's delay of nearly two years before making a report concerning the Spring 2014 allegation when assessing credibility, Simons pointed to Jane Roe's description to BPD of the situation as "freaky because [Plaintiff] was so drunk at the time"[17] and "it was painful for her to relive the emotions of that night." Simons then relied on the OCR's 2014 Guidance which states "[s]chools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence." E-2 at p. 22. This language does not suggest—as misinterpreted by Simons—that all complainants who delay reporting are credible or that a delay cannot be considered in evaluating the merits of a complaint.

Nor did Simons account for the fact that, per the 2013-2014 Student Conduct Code "[a]n unreasonable delay in reporting…is an appropriate consideration in evaluating the merits of a complaint." Simons' presumption that Jane Roe was credible because she was traumatized, *i.e.* a trauma-informed approach, was an indicator of gender bias in her review.

iv.   Simons dismissed Plaintiff's assertion that the Standing Review Committee rubber stamped the Confidential Final Report, despite her acknowledgment that the Committee spent less than one day with the 55-page report. Simons provided no information about the members of the Committee or the training that they received.

v.   Simons relied on the purported similarities in Jane Roe's and Plaintiff's account of what happened in Spring 2014, to uphold the investigators' finding, ignoring that Jane Roe did not provide a consistent account of whether or not non-consensual sexual contact occurred or whether Plaintiff touched her genitals. The interview relied upon by Simons in concluding that non-consensual sexual contact occurred

---

[17] Jane Roe later contradicted this statement by telling investigators that she and Plaintiff engaged in a coherent heart to heart discussion prior to their sexual encounter.

was fraught with contradictions as to what occurred. She was also asked leading questions by the BPD investigator, which was ignored.

134.    CU Boulder's policies and procedures as misapplied by Hasselbacher and Walker, and justified by Simons, denied Plaintiff his right to a fair and impartial process. The conflicting and inconsistent evidence gathered did not support a finding of responsibility with respect to the Spring 2014 allegation, nor was the sanction issued by Simons proportional to the offense allegedly committed.

135.    Hasselbacher and Simons had conflicts of interest which should have precluded them from participating in Plaintiff's case as decisionmakers. Each also had backgrounds as women's advocates.

136.    Upon information and belief, Walker lacked the requisite experience to conduct a fair and impartial investigation into the Spring 2014 allegations.

137.    Upon information and belief, CU Boulder trains Title IX personnel to adopt a trauma-informed approach, which presumes that female complainants always tell the truth, discourages investigators from asking questions directly relating to complainant credibility and presumes that male respondents are typically the sexual aggressors in sexual interactions between students.

138.    The Standing Review Committee failed to conduct a fair and impartial review of the Confidential Final Report, as evidenced by the less than 24 hours it took for the Committee to review the wealth of evidence in the investigative file and the 55-page report. Upon information and belief, the Committee members who participated in Plaintiff's case were not adequately trained.

139.     Simons who had a vested interest in the outcome of Plaintiff's case due to her position as Title IX Coordinator, should not have been tasked with—and should not have conducted—the administrative review because of the potential for bias. Simons also appointed herself to conduct the administrative review, which was inherently biased because she was solely responsible for determining the sanction in Plaintiff's case and, thus, reviewed her own decision for procedural errors and bias.

140.     As a result of CU Boulder's actions and omissions, Plaintiff suffered financial harm, including a debt assessed against him by the federal government for his ROTC scholarship, a significant delay in the completion and conferral of his undergraduate degree, a significant delay in his career plans, and loss of opportunities with respect to his planned career. Plaintiff also suffered emotional distress as a result of CU Boulder's actions and omissions.

## COUNT I

### Violation of Title IX of the Education Amendments of 1972
### (Against CU Boulder)

141.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

142.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

143.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant CU Boulder.

144.    CU Boulder is part of the University of Colorado system, with its principal administrative offices in Denver, Colorado. CU Boulder is authorized, supervised and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes. In 2015 and 2016, CU Boulder received over $600 million in federal grants and contracts.

145.    Students attending public universities such as CU Boulder who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22 (the "2001 OCR Guidance"); April 2011 Dear Colleague Letter at 12.

146.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[18]

147.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

    i.    "Notice . . . of the procedure, including where complaints may be filed";

    ii.    "Application of the procedure to complaints alleging [sexual] harassment...";

---

[18] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

    iii.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

    iv.   "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

    v.   "Notice to the parties of the outcome of the complaint......"[19]

148.    Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.

149.    Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

150.    An "erroneous outcome" occurred in this case. Plaintiff was innocent and wrongly found to have committed a violation of CU Boulder's policies, and gender bias was a motivating factor.

151.    Based on the foregoing, CU Boulder failed to conduct an adequate, reliable, and impartial investigation of Jane Roe's complaint.

152.    CU Boulder also denied Plaintiff's right to due process by: i) misapplying the 2015-2016 OIEC Procedures to the Spring 2014 allegation; ii) denying Plaintiff the right to ask questions of Jane Roe or the witnesses in the case, to test credibility or for purposes of cross-examination; iii) tasking investigators Hasselbacher and Walker with investigating the allegation and issuing the finding; iv) failing to give Plaintiff adequate time to review the investigative file before issuing the written evidence summaries; v) putting Plaintiff's file review on hold during Vice President

---

[19] *Id.* at 20.

Biden's visit; vi) failing to adequately train the Standing Review Committee members; vii) allowing the Standing Review Committee members to rubber stamp the Confidential Final Report; tasking Title IX Coordinator Simons with issuing the sanction; viii) denying Plaintiff the right to an appeal before the appeal committee (which would have been permitted under the 2013-2014 Student Conduct Code); and ix) permitting Simons to unilaterally conduct an "administrative review" of her own sanction.

153.    Students accused of far lesser violations than sexual misconduct were permitted to submit written questions for witnesses, in some cases had a conduct hearing and had a right to appeal a suspension or expulsion, which was reviewed by an appeal committee.

154.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous finding and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, without limitation:

i.    Beginning in 2013 and through the time when Jane Roe's complaint was investigated, CU Boulder was subject to immense federal, local and campus pressure to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct complaints; and issue more severe sanctions to those found responsible for sexual misconduct. Such pressure included the ongoing OCR investigation, student outcry regarding compliance with the White House's *Not Alone* report, the public announcement that OCR was investigating CU Boulder and President Biden's visit to campus during the investigation of the Spring 2014 allegation;

ii.   Upon information and belief, investigators Hasselbacher and Walker received "trauma-informed investigation" training which perpetuated the idea that female victims of sexual assault should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants always tell the truth. This approach caused Hasselbacher and Walker to overlook profound inconsistencies in Jane Roe's account of the Spring 2014 allegation and to fabricate credibility issues in Plaintiff's account;

iii.   The evidence collected during the investigation did not support Jane Roe's account of non-consensual sexual contact. Rather, the evidence supported Plaintiff's account;

iv.   Investigator Hasselbacher had a conflict of interest in her role because part of her responsibilities within OIEC was to ensure CU Boulder's compliance with Title IX;

v.   Investigator Hasselbacher had a lengthy career as a women's advocate, working with victims of domestic violence and sexual assault;

vi.   Title IX Coordinator and OIEC Executive Director Simons, who was tasked with issuing the sanction, had a conflict of interest in this role because she was responsible for the University's compliance with Title IX, involved in the OCR investigation, and reported sanction statistics directly to Chancellor DiStefano.

vii.   Prior to joining CU Boulder, Simons worked as an advocate for women's rights as an education and civil rights attorney, including with the Department of Justice. While working as CU Boulder's Title IX Coordinator, she gave at least one

presentation on Title IX to the American Association of University Women. Simons also appeared in It's On Us videos during the time in which the Spring 2014 allegation was investigated; and

viii.   As part of the sanction, Simons required Plaintiff to undergo an evaluation and treatment by a licensed sex offender provider at his own cost.

155.   Upon information and belief, Defendant CU Boulder has not modified its disciplinary procedures under the present Trump Administration even though, on September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014 on the ground that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process [and] are overwhelmingly stacked against the accused." *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

156.   Upon information and belief, Defendant CU Boulder possesses communications and documents evidencing a predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

157.   Upon information and belief, Defendant CU Boulder has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct.

158.   Upon information and belief, Defendant CU Boulder's mishandling of Jane Roe's Spring 2014 allegation was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

159.     Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

160.     As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

161.     As a result of CU Boulder's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing CU Boulder to (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) confer Plaintiff's degree by applying existing credit hours that Plaintiff accrued to cover the 6 elective credits that he was unable to complete as a result of his wrongful suspension or, in the alternative, allow Plaintiff to return to CU Boulder at a time of his choosing in order to complete the six credit hours remaining for receiving his degree without the imposition of any conditions for readmission to the University.

162.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process**
**(Against DiStefano)**

163.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

164.     Chancellor DiStefano is the CU Boulder official charged with ensuring that student education records, including transcripts, are disclosed to third-party requesters.

165.     Upon information and belief, Chancellor DiStefano is also the CU Boulder official responsible for the conferral of degrees to CU Boulder students.

166.     Chancellor DiStefano was responsible for implementing the Student Conduct Code and OIEC Policies and Procedures at issue in Plaintiff's case.

167.     Chancellor DiStefano was responsible for creating the OIEC and hiring Title IX Coordinator and OIEC Executive Director Simons and overseeing her work in ensuring CU Boulder's compliance with Title IX. Simons reported directly to DiStefano, provided him with statistics on sanctions issued for sexual misconduct violations at CU Boulder.

168.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

169.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

170.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

171.   Plaintiff's constitutionally protected property interest in his continued enrollment at CU Boulder and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by CU Boulder.

172.   Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between CU Boulder and Plaintiff.

173.   It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

174.   CU Boulder, a state university, is part of the University of Colorado system, with its principal administrative offices in Denver, Colorado. CU Boulder is authorized, supervised and funded by the State of Colorado pursuant to the Colorado Constitution and Title 23, Article 20 of the Colorado Revised Statutes. CU Boulder has a duty to provide its students equal protection and due process of law by and through any and all procedures set forth by the University.

175.   Plaintiff had obeyed all institutional rules when he was wrongly suspended from CU Boulder.

176.   Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Plaintiff was deprived of a fundamentally fair process. Plaintiff's right to due process was violated when:

    i.   OIEC personnel withheld service of the Notice of Investigation—at the request of BPD—until after Plaintiff was interviewed by Detective Beckjord.

ii.     Plaintiff was required to schedule a meeting within 3 days of receiving the Notice of Investigation or conclusions would be drawn against him. In contrast, Jane Roe had no time constraints placed on her throughout the course of the investigation.

iii.    Plaintiff was provided no form of hearing and was permitted to ask no questions of the complainant or any other witnesses. Students accused of violations other than sexual misconduct were permitted to submit written questions to be asked of complainant and, in certain cases, a hearing was held.

iv.     Plaintiff was denied access to the investigative file until after Vice President Biden's visit then Hasselbacher and Walker issued the written evidence summary prior to Plaintiff's review of the file.

v.      Hasselbacher and Walker failed to question Jane Roe's credibility and misstated facts about the Spring 2014 allegation in order to find Plaintiff responsible for violating the Student Conduct Code.

vi.     OIEC failed to provide Plaintiff with any information about the Standing Review Committee, including any right to challenge the members reviewing the Confidential Investigation Report;

vii.    The Standing Review Committee took less than one day to review the investigative file and read the 55-page report;

viii.   Simons, who had a vested interest in the outcome of Title IX cases at CU Boulder, issued the sanction.

ix.     Plaintiff was denied the right to an appeal before an appeal committee. Students accused of violations other than sexual misconduct are given this right. Plaintiff was also entitled to an appeal, or seek to leave to appeal, by an appeal committee under the Student Conduct Code.

x.      Simons tasked herself as the sole individual responsible for conducting an administrative review of Plaintiff's appeal.

178.    CU Boulder deprived Plaintiff of his liberty and property interests without affording

him basic due process, including but not limited to, his right to be notified of the charges against

him, his right to a fair adjudication, his right to be heard by an impartial factfinder, to question his

accuser, to challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

179.    CU Boulder failed to provide Plaintiff with the basic due process protections that it was required to provide students accused of sexual misconduct at a state university.

180.    CU Boulder, DiStefano, as well as other agents, representatives and employees of CU Boulder intentionally, willfully, wantonly, oppressively and maliciously violated Plaintiff's due process rights.

181.    CU Boulder deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication. Specifically, CU Boulder was under OCR investigation at the time of the investigation into Jane Roe's Spring 2014 allegation and potentially risked the loss of federal funding or other penalty if they found in favor of Plaintiff.

182.    Based on the foregoing, CU Boulder violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the Spring 2014 allegation.

183.    As a result of the foregoing, Plaintiff is entitled to prospective injunctive relief expunging Plaintiff's disciplinary record; removing any record of Plaintiff's suspension from his education file; destroying any and all records pertaining to Jane Roe's complaint; and conferring Plaintiff's degree by applying existing credit hours that Plaintiff accrued to cover the 6 elective credits that he was unable to complete as a result of his wrongful suspension or, in the alternative, allow Plaintiff to return to CU Boulder at a time of his choosing in order to complete the six credit hours remaining for receiving his degree without the imposition of any conditions for readmission to the University.

**COUNT III**
**Breach of Contract**
**(Against CU Boulder)**

184.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

185.     At all times relevant hereto, a contractual relationship existed between CU Boulder and Plaintiff through CU Boulder's policies and procedures governing the student disciplinary system, including but not limited to the Student Conduct Code and the OIEC Policies and Procedures.

186.     Through the documents it publishes and provides to students, CU Boulder makes express contractual commitments to students involved in a disciplinary process.

187.     Based on the foregoing, CU Boulder created express and implied contracts with Plaintiff.

188.     The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

189.     Based on the aforementioned facts and circumstances, CU Boulder breached express and/or implied agreement(s) with Plaintiff.

190.     CU Boulder committed several breaches of its agreements with Plaintiff during the investigation and hearing process, including, without limitation:

   i.     The University failed to employ investigators who had the appropriate training, qualifications and experience to "facilitate a prompt, fair, equitable and impartial investigation." 2015-2016 OIEC Process and Procedures § H.4.

   ii.    Hasselbacher and Walker issued the written evidence summary prior to Plaintiff's review of the investigation file, denying him the opportunity to respond within the requisite seven-day period. 2015-2016 OIEC Process and Procedures § 6.a.3.

iii.   OIEC applied the wrong procedures to Jane Roe's Spring 2014 allegation, The OIEC's 2015-2016 Process and Procedures were applied, even though those very Procedures state that "the date of the alleged incident determined which Process and Procedures (or applicable Student Code of Conduct prior to 2015-2016) will apply." 2015-2016 OIEC Process and Procedures § C.2.

This prejudiced Mr. Norris as the applicable 2013-2014 Student Conduct Code allowed CU Boulder administrators to consider a complainant's unreasonable delay in reporting an incident when evaluating the merits of a complaint or report. App. 1 § D.2. The 2013-2014 Student Conduct Code also provided for the right to an appeal to an appeal committee. § K.

iv.   OIEC failed to resolve the complaint in a timely manner. 138 days, or nearly five (5) months, elapsed between the time that OIEC received the Complainant's report about the alleged incident and the investigators issued their final report. 2013-2014 Student Conduct Code App. 1 D. 6; 2015-2016 OIEC Process and Procedures § H.6.a.vii.

v.   The "standing review committee," about which Mr. Norris was provided no information,[20] took **less than 1 day** to review the evidence file and 55-page final investigation report, rubber stamping the investigators' finding. The committee could not have conducted the thorough review required under the Student Conduct Code and OIEC Process and Procedures in such a short time period. 2015-2016 OIEC Process and Procedures § H.6.a.v; 2013-2014 Student Conduct Code App. 1 § D. 6.

vi.   The Standing Review Committee was not adequately trained. 2015-2016 OIEC Process and Procedures § H.6.a.v; 2013-2014 Student Conduct Code App. 1 § D. 6.

vii.   The investigators failed to apply the "preponderance of the information" standard under the 2013-2014 Student Conduct Code, or "preponderance of the evidence" under the 2015-2016 OIEC Process and Procedures. 2013-2014 Student Conduct Code § H.4 and App. 1 § D.5; 2015-2016 OIEC Process and Procedures § H.6.c.

viii.   Simons issued the sanction rather than her designee or the OSC Director. 2015-2016 OIEC Process and Procedures H.6.e; 2013-2014 Student Conduct Code App. 1 § D.9.

---

[20] The only information that Mr. Norris received in regard to the committee was a notation in the investigators' "Notice of Finding" that "the investigators' finding was reviewed and approved by a review committee."

ix.   Simons' "administrative review" which she improperly undertook according to the OIEC 2016-2017 Process and Procedures, was ineffectual because Simons was responsible for issuing the sanction in the first instance. The review was, accordingly, a sham process. Simons should have appointed a designee. 2016-2017 OIEC Process and Procedures § C.5.

191.   Based on the aforementioned facts and circumstances, CU Boulder breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

192.   As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

193.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)   on the first count for violation of Title IX of the Education Amendments of 1972, a judgment against CU Boulder awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against CU Boulder as a result of CU Boulder's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing CU Boulder to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) confer Plaintiff's degree by applying existing credit hours that Plaintiff accrued to cover the 6 elective credits that he was unable to complete as a result of his wrongful suspension or, in the alternative, allow Plaintiff to return to CU Boulder at a time of his choosing in order to complete

the six credit hours remaining for receiving his degree without the imposition of any conditions for readmission to the University;

(ii)     on the second count for violation of constitutional due process under 42 U.S.C. § 1983, an injunction directing DiStefano to (i) expunge Plaintiff's disciplinary record; (ii) remove any record of Plaintiff's suspension from his education file; (iii) permanently destroy any record of Jane Roe's complaint; and (iv) confer Plaintiff's degree by applying existing credit hours that Plaintiff accrued to cover the 6 elective credits that he was unable to complete as a result of his wrongful suspension or, in the alternative, allow Plaintiff to return to CU Boulder at a time of his choosing in order to complete the six credit hours remaining for receiving his degree without the imposition of any conditions for readmission to the University

(iii)    on the third count for state law breach of contract, a judgment against CU Boulder awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    an injunction directing CU Boulder to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; (iv) permanently destroy any record of Jane Roe's complaint; and (v) confer Plaintiff's degree by applying existing credit hours that Plaintiff accrued to cover the 6 elective credits that he was unable to complete as a result of his wrongful suspension or, in the alternative, allow Plaintiff to return to CU Boulder at a time of his choosing in order to complete the six credit hours remaining for receiving his degree without the imposition of any conditions for readmission to the University; and

(v)     awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: August 30, 2018

Respectfully Submitted,


By: ____*/s/Andrew T. Miltenberg*____
Andrew T. Miltenberg, Esq.
Kara L. Gorycki, Esq.
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 1000
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmlllplaw.com



By: ____*/s/ Lara Marks Baker*_____
Lara Marks Baker, Esq.
John A. Chanin, Esq.
FOSTER GRAHAM MILSTEIN & CALISHER, LLP
360 South Garfield Street, Suite 600
Denver, CO 80209
(303) 333-9810
lbaker@fostergraham.com
jchanin@fostergraham.com

***Attorneys for Plaintiff William Norris***

**William Norris**
**4731 Emden Hollow**
**San Antonio, TX 78247**