**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No.: 1:18-cv-02243-LTB

WILLIAM NORRIS,

      Plaintiff,

                v.

UNIVERSITY OF COLORADO, BOULDER (through its Board, the Regents of the University of Colorado, a body corporate) and PHILIP P. DISTEFANO,

      Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**COMPLAINT AND JURY DEMAND PURSUANT TO**
**F.R.C.P. 12(b)(6) AND F.R.C.P. 12(b)(1)**

Plaintiff William Norris ("Plaintiff" or "Mr. Norris"), by and through his undersigned attorneys, submits this memorandum of law in opposition to University of Colorado, Boulder's ("CU Boulder" or the "University") and Philip P. DiStefano's ("DiStefano") (collectively referred to herein as "Defendants") motion to dismiss the Complaint. As and for his opposition, Plaintiff states the following:

## **INTRODUCTION**

On August 30, 2018, Plaintiff filed the Complaint, alleging (i) a Title IX erroneous outcome claim against CU Boulder; (ii) a 42 U.S.C. § 1983 claim against Chancellor DiStefano seeking injunctive relief for the University's violation of Plaintiff's right to due process in the sexual misconduct proceedings against him; and (iii) state law breach of contract. On November 6, 2018, Defendants moved to dismiss the Complaint in its entirety. As fully set forth below, the motion should be denied.

Plaintiff has alleged a plausible Title IX erroneous outcome claim against CU Boulder. Plaintiff has alleged numerous flaws in the process against him, including *inter alia* having no right to cross-examination, that cast articulable doubt on the outcome of the proceedings. The University's erroneous finding resulted in the unwarranted and severe sanction of an 18-month suspension for a stale allegation that Plaintiff touched Jane Roe's genitals without her consent—there was no evidence supporting Roe's claim. Defendants incorrectly assert that Plaintiff admitted that he engaged in nonconsensual sexual contact with Roe, but this argument fails in the face of the Complaint's clear allegations to the contrary, which the Court must accept as true at this stage. Defendants further assert that Plaintiff merely disagrees with the outcome and such disagreement is not actionable. However, the available evidence substantially favored Plaintiff's side yet the investigators decided in favor of Roe, raising the inference that the Title IX investigators were motivated by a bias against Plaintiff as the male accused.

Plaintiff has also plausibly alleged that the finding and sanction in his case were motivated by gender bias. Plaintiff alleges: i) that CU Boulder was under immense public pressure to address female students' claims of sexual assault, including a federal investigation; ii) the lead investigator in Plaintiff's case had an extensive career as an advocate for female victims of domestic violence and sexual assault; iii) the individual responsible for determining Plaintiff's sanction was also an advocate for women, the public voice of the University's commitment to protecting female students and responsible for reporting sexual misconduct statistics to the Chancellor. As further detailed *infra*, said allegations are more than sufficient at the pleading stage to permit Plaintiff's case to move forward to discovery.

It is unclear why Defendants have moved to dismiss Plaintiff's due process claim against Chancellor DiStefano, when they are currently litigating a similar due process claim before Judge

Martinez which previously survived a motion to dismiss. Regardless, Plaintiff has alleged "exceptionally robust" interests in continuing his education and in his reputation, which outweigh any burden CU Boulder might have faced in providing him a hearing and the right to cross-examination, rights which are afforded to students accused of far less serious offenses. Plaintiff has also alleged bias in the investigation and sanctioning process. Plaintiff has further alleged that the University's withholding of the notice of investigation and restriction of Plaintiff's access to the investigation file deprived him of a meaningful opportunity to be heard.

The University has asserted Eleventh Amendment immunity with respect to Plaintiff's state law breach of contract claim. Should the Court agree that the University is immune from federal suit, Plaintiff respectfully requests that the Court dismiss this claim without prejudice.

<u>**THE ALLEGATIONS OF THE COMPLAINT**</u>

A.      <u>**Plaintiff's Background**</u>

While attending CU Boulder, and until Jane Roe ("Roe') falsely accused him of sexual misconduct, Mr. Norris had an unblemished disciplinary and academic record. He was enrolled in Air Force ROTC, maintained a 3.5 GPA as a major in mechanical engineering, and was an exemplary ROTC cadet. Compl. ¶¶ 2, 38-39. Upon graduation, Mr. Norris was committed to joining the United States Air Force as a Lieutenant and pursuing a military career. *Id.* ¶ 38. His aspirations were sidelined when CU Boulder found him responsible for non-consensual sexual contact (for allegedly touching Jane Roe's genitals without her consent) and suspended him for eighteen (18) months—when he was just 6 credits shy of graduating. *Id.* ¶¶ 2, 119, 126. The University also placed conditions on his return to school and, thus, there were no guarantees that Mr. Norris would be permitted to complete his degree. *Id.* ¶ 126.

Mr. Norris faced criminal prosecution for Roe's allegations against him and, on October 19, 2017, a jury of his peers found him not guilty of all charges. *Id.* ¶¶ 5, 57 & n. 8. Mr. Norris' case is an exemplar of the injustice that occurs as a result of universities applying a low burden of proof, the preponderance of the evidence standard, in sexual misconduct cases. Under this scenario, an individual may be found not guilty, and acquitted of all charges in a criminal case but may still have his future destroyed. *Id.* ¶ 7. In September 2017, the U.S. Department of Education recognized this problem and issued new guidance permitting colleges and universities to apply the "clear and convincing evidence" standard in sexual misconduct proceedings. *Id.* ¶ 7 & n. 2.

B.  **Mr. Norris' Relationship With Jane Roe**

Mr. Norris and Roe became friends during the 2013-2014 academic year, when Mr. Norris was a sophomore and Roe a first-year student. *Id.* ¶ 51. There was a romantic component to their friendship and the two would frequently "make out." *Id.* ¶ 53. Roe told people in their circle of friends that she was in love with Mr. Norris. *Id.* However, Mr. Norris was dating someone else, a woman who was friends with Roe. *Id.* ¶ 55. In July 2015, Roe stopped speaking to Mr. Norris and his girlfriend. This occurred after Mr. Norris and Roe had briefly engaged in consensual sexual intercourse, which he interrupted because he felt guilty about being unfaithful to his girlfriend. *Id.* ¶ 54-55.

C.  **Roe's Allegations Against Plaintiff**

On or about January 20, 2016, Roe filed a report with the Boulder Police Department ("BPD") alleging that Plaintiff sexually assaulted Roe when they engaged in sexual intercourse in July 2015 and that—nearly two years prior—in Spring 2014, Plaintiff touched Roe's genitals without her consent. *Id.* ¶ 57. The July 2015 sexual assault allegation is not at issue in this action because CU Boulder found Plaintiff not responsible for this act. *Id.* ¶ 69.

With respect to the Spring 2014 allegation, Plaintiff and Roe attended a party at his off-campus resident where both were drinking a fair amount and were tipsy. *Id.* ¶ 52. After the party, the two went to his bedroom where they were kissing and moved to his bed, where they began to playfully wrestle. *Id.* During the play wrestling, Plaintiff pinned Roe's arms above her head and moved his hand down her body towards her genitals when Roe said "no." *Id.* Plaintiff respected Roe's wishes and stopped the interaction. *Id.* The two talked and kissed for the rest of the night until Jane Roe left in the early morning hours. *Id.* Roe and Plaintiff continued their friendship, and their physical relationship, until July 2015. *Id.* ¶¶ 53-56.

At no point was Roe able to provide a clear account of what happened with Plaintiff in Spring 2014. *Id.* ¶ 102. Her varying accounts to BPD and CU Boulder's Title IX investigators did not demonstrate by a preponderance of the evidence that any genital contact occurred, which was necessary to support a finding of non-consensual sexual contact. *Id.* ¶¶ 41, 103. CU Boulder's investigators asked her only to respond to Plaintiff's account rather than telling them her account of what happened. *Id.* ¶ 102. There were no eyewitnesses and the investigators failed to interview a purported outcry witness "JG." *Id.* ¶ 103.

The witnesses that were interviewed gave accounts that were inconsistent with Roe's story. *Id.* ¶ 104. Roe was permitted to explain these away under the guise of her friends being protective of her. *Id.* One of Roe's witnesses later apologized to Mr. Norris for her involvement in the case and admitted that she overreacted. This was around the time that CU Boulder suspended him. *Id.* ¶ 104 & n. 13. Prior to any witnesses being interviewed, Roe held a meeting with all of her and Plaintiff's mutual friends to tell them her account of what allegedly happened. *Id.* ¶ 71.

**D.** **CU Boulder's Campus Climate**

In May 2013, a female student filed a complaint with the U.S. Department of Education's Office for Civil Rights ("OCR") claiming that CU Boulder violated Title IX by failing to issue a severe enough sanction against the male respondent in her case, who was found responsible for sexual assault. *Id.* ¶ 22. The student publicly announced that in filing the complaint she was forced to do the University's "dirty work." *Id.* Shortly thereafter, OCR opened an investigation into the complaint that carried on until September 2017, or fifteen (15) months *after* Plaintiff was suspended. *Id.* On May 1, 2014, the Department of Education issued a press release naming CU Boulder as one of fifty-five (55) colleges and universities under investigation. *Id.* ¶ 25. The press release noted that "Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the Department of Justice for further action." *Id.* On the same day, the *CU Independent* published an article which noted that CU Boulder had come under fire for its handling of sexual assault complaints multiple times in the prior year. *Id.* ¶ 27.

On May 10, 2014, local press reported that the University had settled the case with the female OCR complainant, who publicly declared that the University needed to gear its policies to "cater towards survivor needs." *Id.* ¶ 28. Shortly thereafter, Chancellor DiStefano hired Valerie Simons ("Simons") to serve as Title IX Coordinator. *Id.* ¶ 30. DiStefano publicly lauded Simon's reputation as a DOJ advocate and her work with female university students. *Id.*

In January 2015, CU Boulder held a sexual misconduct "town hall" focusing on the *It's On Us* campaign, known for its focus on female victims of sexual assault. *It's On Us* also runs media campaigns which portray men as rapists. *Id.* ¶ 34 & n. 6. The focus of the town hall, in which BPD participated, was to confirm that the University was putting survivors "back in the driver's seat" and "working hard to make the process as survivor-focused as possible." *Id.*[1]

---

[1] Notably, referring to sexual assault complainants as "survivors" presumes that a sexual assault has occurred.

In February 2016, weeks after Roe had filed her complaint against Mr. Norris, the *CU Independent* published an opinion piece which criticized CU Boulder for administering lax punishments in sexual misconduct cases and fostering a "rape culture…which…teaches young men that drunken hookups are a space of free reign where anything goes." *Id.* ¶ 35.

On April 8, 2016, then Vice President Joe Biden delivered a speech to the CU Boulder campus as part of the "*It's On Us* Week of Action." *Id.* ¶ 36. Ahead of the visit, DiStefano and Simons appeared in an *It's On Us* video in which DiStefano noted that the University shared the same goals as the Vice President. *Id.* When Biden gave his speech, he focused on protecting women and asked men on campus to "Look in the mirror and ask, are you being the man you think you are?" *Id.* ¶ 37. CU Boulder's Office of Government Relations wrote about the visit in its Government Relations newsletter. *Id.* The University's alumni association described the visit as a "test of character." *Id.* Biden's visit occurred in the midst of the University's investigation of Roe's allegations against Mr. Norris. The Title IX investigators, Lauren Hasselbacher ("Hasselbacher") and Tessa Walker ("Walker") delayed Mr. Norris' access to the investigation file because the Office of Institutional Equity and Compliance ("OIEC") was preparing for Biden's visit. *Id.* ¶ 85.

## E.    The Sexual Misconduct Process

Under the sexual misconduct policy applied in Plaintiff's case he had no right to a hearing. Rather, the University followed an "investigative model." *Id.* ¶ 47(x). There was also no mechanism through which Plaintiff could cross-examine Roe or ask questions of the witnesses. *Id.* ¶ 47 (xii). CU Boulder students accused of far less serious offenses had the right to a hearing and a method by which they could submit written questions to be asked of the complainant and/or any witnesses. *Id.* ¶ 47(x), (xii).

The University's investigators, Hasselbacher and Walker, were tasked with determining whether Plaintiff was responsible for sexual misconduct. *Id.* ¶¶ 59-61. Hasselbacher, the lead investigator, had a conflict of interest because her job also required her to ensure that CU Boulder's policies and procedures complied with Title IX. *Id.* ¶ 59. Hasselbacher had a background in Women's Studies, extensive experience as an advocate for women who have experienced domestic violence and sexual assault, and also worked as a civil rights lawyer prior to joining CU Boulder. *Id.* Walker lacked the necessary experience to serve as a Title IX investigator. *Id.* ¶ 60. During the investigation, Hasselbacher and Walker worked closely with BPD and acted more favorably to Jane Roe than they did to Plaintiff. *Id.* ¶¶ 62-66, 70, 76-88, 90-95, 100-113. Ultimately, Hasselbacher and Walker found Plaintiff responsible for nonconsensual sexual contact because they found Roe to be more credible than Plaintiff, despite glaring inconsistencies in her varying accounts of what happened. *Id.* ¶¶ 103-104. Relying on a BPD interview in which the questioning officer gave Plaintiff a false narrative of what Roe had alleged, the investigators misread Plaintiff's statements to them as inconsistent with what he told BPD. *Id.* ¶¶ 105-113. The erroneous finding of responsibility—determined while the OCR investigation was pending and after Vice President Biden's visit—was grounded in the pressure that Hasselbacher and Walker were under to maintain CU Boulder's public commitment to protecting female victims of sexual assault and to appease Jane Roe, whom they knew had filed a criminal complaint against Plaintiff. *Id.* ¶¶ 113-116. Hasselbacher, a women's advocate, also viewed the facts through a gender-biased lens. *Id.* ¶ 116.

On June 13, 2016 Hasselbacher and Walker emailed a Notice of Finding to Plaintiff finding him responsible for non-consensual sexual contact. *Id.* ¶ 119. The Finding was grounded in numerous misstatements of fact. *Id.* ¶¶ 117-120.  The Notice stated that the findings had been "reviewed and approved by a review committee." *Id.* At no point was Plaintiff notified as to the

composition of the review committee, he had no right to appear before the committee or make any submissions to the committee. Nor could he challenge the members on conflict of interest grounds. *Id.* ¶ 47 (xiv).

Simons, at the time the Title IX Coordinator and OIEC Director, had the sole responsibility of determining Plaintiff's sanction. *Id.* ¶¶ 121-123. Simons had a conflict of interest because her responsibilities included ensuring CU Boulder's compliance with Title IX and working with OCR during the course of its investigation. *Id.* ¶¶ 123-124. She was the University's public voice against sexual assault and was responsible for compiling and reporting statistics concerning sexual misconduct complaints, including sanctions, to Chancellor DiStefano. *Id.* Prior to joining CU Boulder, Simons was an advocate for female students. *Id.* ¶ 125. She publicly supported women's advocacy groups, as well as the *It's On Us* campaign, during the investigation of Roe's allegations. *Id.* ¶¶ 89, 125.

As a result of these biases, Simons issued the unwarranted and unduly severe sanction which: i) suspended Plaintiff for 18 months; ii) banned Plaintiff from campus; iii) required him to undergo "an evaluation and treatment from a licensed sex offender provider;" iv) required proof of any court-ordered or other sanctions; v) required that any application for readmission be personally approved by Simons; and vi) contained a no-contact order prohibiting contact with Roe. *Id.* ¶ 126.

The Notice of Sanction provided to Plaintiff made no reference to any right to appeal. *Id.* ¶ 121. Plaintiff submitted an appeal under the 2013-2014 Student Conduct Code, which should have been applied in his case. *Id.* ¶ 127. Rather than treating Plaintiff's appeal as just that, Simons applied 2016-2017 OIEC procedures to conduct her own sham administrative review, through which Simons upheld the sanction. *Id.* ¶¶ 132-140. Simons had the option of delegating the review

to a designee but did not choose this option. *Id.* ¶ 49. Unsurprisingly, Simons upheld her own prior

determination that the sanction was appropriate. *Id.* ¶¶ 132-140. Several of Simons' statements

concerning her administrative review were indicative of bias. *Id.* ¶ 133.

## ARGUMENT

### I.     The Legal Standard Governing Motions to Dismiss

As stated in this Court's opinion in *Mondragon v. Adams County School District No. 14*,

No. 1:16-cv-01745, 2017 WL 733317 at *4 (D. Colo. Feb. 24, 2017):

> Under Rule 12(b)(6), '[d]ismissal is appropriate only if the complaint, viewed in the
> light most favorable to plaintiff, lacks enough facts to state a claim to relief that is
> plausible on its face.' *United States ex rel. Conner v. Salina Regional Health Center*,
> 543 F.3d 1211, 1217 (10th Cir. 2008) (quotations marks omitted). A claim is plausible
> on its face 'when the plaintiff pleads factual content that enables the court to draw the
> reasonable inference that the defendant is liable for the misconduct alleged.' *Ashcroft
> v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.
> 544, 556 (2007)). 'The plausibility standard is not akin to a 'probability requirement,'
> but it asks for more than a sheer possibility that a defendant has acted unlawfully.' *Id.*

> Although plaintiffs need not provide 'detailed factual allegations' to survive a motion
> to dismiss, they must provide more than 'labels and conclusions' or 'a formulaic
> recitation of the elements of a cause of action.' *Twombly*, 550 U.S. at 555; *see
> also Ashcroft*, 556 U.S. at 678 (explaining that a complaint will not suffice if it offers
> 'naked assertions devoid of further factual enhancement' (quotations and alterations
> omitted)). Furthermore, conclusory allegations are 'not entitled to be assumed
> true.' *Ashcroft*, 556 U.S. at 679.

> A court may not dismiss a complaint merely because it appears unlikely or improbable
> that a plaintiff can prove the facts alleged or ultimately prevail on the merits. *Twombly*,
> 550 U.S. at 556. Instead, a court must ask whether the facts alleged raise a reasonable
> expectation that discovery will reveal evidence of the necessary elements. *Id.* If, in
> view of the facts alleged, it can be reasonably conceived that the plaintiff could
> establish a case that would entitle him to relief, the motion to dismiss should not be
> granted. *Id.* at 563 n.8.

> Granting a motion to dismiss is a 'harsh remedy' that should be 'cautiously studied' to
> 'effectuate the liberal rules of pleading' and 'protect the interests of justice.' *Idias v.
> City & Cnty. of Denver*, 1178 (10th Cir. 2009).

As detailed below, Plaintiff has alleged a plausible Title IX erroneous outcome claim against CU

Boulder and a plausible claim against DiStefano, pursuant to 42 U.S.C. § 1983, for violation of

Plaintiff's right to due process in the university disciplinary proceedings against him. Plaintiff has also alleged a plausible state law breach of contract claim against CU Boulder. However, there is a question as to whether the Court has subject matter jurisdiction over the breach of contract claim. Should the Court find that it lacks subject matter jurisdiction over this claim, Plaintiff respectfully requests that the Court dismiss this claim without prejudice.

## II.  Plaintiff Has Alleged a Plausible Title IX Erroneous Outcome Claim

In order to establish a violation of Title IX under an "erroneous outcome" theory, a plaintiff must show (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994); *Neal v. Colorado State U.*, No. 16-cv-873, 2017 WL 633045 at **9-11 (D. Co. Feb. 16, 2017) (Shaffer, J.). As set forth below, the Complaint plausibly alleges that there were significant flaws in the disciplinary proceeding which cast doubt on the University's decision to suspend Plaintiff, and that said decision was motivated by gender bias.

### A.  Plaintiff Alleged Facts Which Cast "Some Articulable Doubt" on the Outcome of the Disciplinary Proceedings Against Him

A plaintiff may cast articulable doubt on the outcome of university sexual misconduct proceedings in a number of ways, including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 584 (E.D. Va. Mar. 14, 2018). *See Yusuf*, 35 F. 3d at 715. A university's denial of the opportunity for cross-examination in a case where credibility is at stake is also a fact sufficient to cast articulable doubt on the accuracy of the outcome. *Doe v. Baum*, 903 F.3d 575,

585-586 (6th Cir. 2018).[2] That was precisely the case here. Compl. ¶ 47(xii). Where, as here, a student is acquitted of the criminal sex acts for which he was found responsible in the university proceedings, an erroneous outcome may be inferred. *See Rolph v. Hobart and William Smith Colleges*, No. 6:16-cv-06515, 2017 WL 4174933 at *12 (W.D.N.Y. Sept. 20, 2017). *See* Compl. ¶¶ 1-5, 57 n.8.

Here, Plaintiff alleges that CU Boulder deprived him of a fair and impartial process by: i) withholding service of the Notice of Investigation until after he was interviewed by police (Compl ¶¶ 57-70; 176.i); ii) denying Plaintiff a hearing even though students accused of lesser violations were afforded this right (*Id.* ¶ 47(x), 57-61, 176.iii); iii) denying Plaintiff the right to cross-examine his accuser—even in the form of written questions—though students accused of far less serious conduct were afforded this right (*Id.* ¶¶ 47(xii), 176.iii); iv) precluding Plaintiff from questioning witnesses (*Id.* ¶ 176.iii); v) denying Plaintiff access to the investigation file until after Vice President Biden's campus visit for *It's On Us* and after the investigators issued their summary of the evidence (*Id.* ¶ 176.iv ); vi) using biased investigators—solely tasked with determining responsibility in Plaintiff's case—who failed and refused to question Roe's credibility and misstated the evidence in order to find Plaintiff responsible (*Id.* ¶¶ 99-120, 176.v); vii) failing to provide Plaintiff with any information about the Standing Review Committee, which reviewed the investigators' finding (*Id.* ¶¶ 47(xiv), 176.vi); viii) allowing a review process—the Standing Review Committee—to serve as a "rubber stamp" for the investigative report and give only the appearance of impartiality (*Id.* ¶¶ 47(xiv), 176.vii); ix) allowing the Title IX Coordinator—who

---

[2] *Doe v. U. of Cincinnati*, 173 F. Supp. 3d 586, 607 (S.D. Ohio 2016), relied upon by Defendants to argue that CU Boulder's denial of the right of cross-examination has no relationship to gender bias or Plaintiff's Title IX claim, pre-dates the Sixth Circuit's decision in *Doe v. Baum*. Similar to the plaintiff in *Baum*, and discussed *infra*, Plaintiff, here, alleged a number of procedural flaws affecting the accuracy of the outcome in his disciplinary proceedings as well as facts sufficient to support a claim of gender bias under a totality of the circumstances.

was responsible for reporting sanctioning statistics to DiStefano—to determine Plaintiff's sanction (*Id.* ¶¶ 48, 176.viii); x) denying any right to appeal, when students accused of far less serious misconduct were afforded the right to an appeal before an appeal committee (*Id.* ¶¶ 47 (xvii), 176.ix); and x) allowing the Title IX Coordinator—who determined the sanction in Plaintiff's case—to conduct an "administrative review" of her own prior determination (*Id.* ¶¶ 176.x).

Further indicia of a flawed outcome in the university proceedings against Plaintiff are that Roe filed the university complaint and criminal report against Plaintiff approximately two years after the Spring 2014 encounter and six months after she and Plaintiff had sexual intercourse. Compl. ¶¶ 51-58. Roe also confessed to being in love with Plaintiff. *Id.* ¶ 53. The last conversation that Plaintiff had with Roe, before she falsely accused him of sexual misconduct, was about Plaintiff's relationship with his girlfriend, who was also Roe's close friend. *Id.* ¶¶ 54-55. Before witness interviews were conducted by BPD or CU Boulder investigators, Roe met with all of her and Plaintiff's mutual friends to tell them her account of what allegedly happened with Plaintiff. *Id.* ¶ 71. One key witness, who was present at Roe's meeting, later apologized to Plaintiff for her involvement, stating that she overreacted to Roe's story. *Id.* ¶¶ 74 & n. 9, 104.ii & n. 12. *See Neal*, 2017 WL 633045 at *9 (facts which cast articulable doubt on the outcome include a motive to lie on the part of the complainant or witnesses) (quoting *Yusuf*, 35 F.3d at 715). Roe's motives were never questioned, nor were the witness' motivations. *Id.* CU Boulder investigators also overlooked numerous inconsistencies in Roe's and her witness' accounts, erroneously finding her to be more credible despite the lack of credible evidence to support her allegation. *Id.* ¶¶ 99-120.

Defendants argue that Plaintiff has failed to cast articulable doubt on the outcome of the proceedings against him because he "admits that he 'pinned Jane Roe's arms over head' and 'moved his hand down Jane Roe's body *towards* her genitals.'" Moving Br. at 4 (emphasis added).

Yet the Code definition cited by Defendants (Moving Br. at 4), and in the Complaint (¶ 41), requires an intentional *touching* of the genitals, not moving towards them. Compl. ¶ 52. Defendants also fail to cite the full allegation, which shows that nonconsensual touching did not occur:

> The two moved to his bed and began to playfully wrestle during which Plaintiff pinned Jane Roe's arms over her head. During this interaction, Plaintiff moved his hand down Jane Roe's body towards her genitals when Jane Roe said "no." Plaintiff respected Jane Roe's wishes and stopped the interaction. The two continued to talk and kiss for the rest of the night. Jane Roe slept over Plaintiff's house and left at approximately 6:00 a.m. *Id.*

In contrast, as alleged in the Complaint, "at no point was [Roe] able to provide a clear account of what happened" including whether Plaintiff made contact with her genitals. *Id.* ¶¶ 101-103(iv), (v).

Contrary to Defendants' assertion, there is more at issue here than Plaintiff's disagreement with the outcome of the disciplinary proceedings against him. As set forth above, and further explained below, there were numerous, alleged flaws in the proceeding, Roe had a motive to be dishonest, and there were numerous inconsistencies in Roe's statements to BPD and the OIEC investigators which discredited her account. "Where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side," it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d 46, 57 (2d Cir. 2016).[3] As set forth below, there is also ample, plausible support to infer that this bias was on account of Plaintiff's sex. *Id.*

### B. Plaintiff Has Alleged Facts That Support A Plausible Inference That Gender Bias Was A Motivating Factor in the University's Decision to Suspend Him For Eighteen Months

---

[3] *Doe v. Purdue University*, 281 F. Supp. 3d 754, 778 (N.D. Ind. 2017), cited by Defendants, is inapposite. In *Purdue*, which is currently on appeal before the Seventh Circuit, the court found that the plaintiff did not specify any facts from either his own testimony, his written statements, or the complainant's statement to support his argument that the facts were not properly weighed or to suggest that the evidence "substantially favors" his version of the events. *Id.* at 778 (citing *Doe v. Columbia U.*).

14

Gender bias may be proven *inter alia* through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender.[4] *Yusuf*, 35 F. 3d at 715. *See Neal*, 2017 WL 633045 at * 10. *See also Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017); *Columbia U.*, 831 F.3d 46, 57 (2d Cir. 2016). Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Marymount U.*, 297 F. Supp. 3d at 586.

Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias. *Baum*, 903 F.3d at 586-587 (external pressure combined with hearing board's credibility determinations in favor of females raised plausible inference of gender bias). *See also Neal*, 2017 WL 633045 at *12 (allegations that university under OCR pressure to enforce "Dear Colleague Letter" in a gender-skewed manner sufficient to plead gender bias); *Miami U.*, 882 F.3d at 592-93 (plausible inference of gender bias where *inter alia* university faced pressure to zealously "prosecute" male respondents after facing lawsuit by female student); *Columbia U.*, 831 F.3d at 58 (gender bias inferred where university was motivated to accept female accusation of sexual assault and reject male's claim of consent to avoid further public criticism that it did not protect female students). As detailed below, taking the allegations of the Complaint as true, and drawing all reasonable inferences in Plaintiff's favor, the totality of the circumstances alleged in the Complaint raise a plausible inference that the outcome of Plaintiff's disciplinary proceeding was motivated by gender bias. *See Doe v. Washington & Lee U.*, 2015 WL 4647996 at *10 (W.D. Va. Aug. 5, 2015).

---

[4] Discovery is required to determine whether a university has engaged in a pattern of decision making that tends to show the influence of gender. Universities, including CU Boulder, do not publish statistics concerning the outcomes of sexual misconduct proceedings or the gender of those students who have been found responsible and sanctioned.

1.     **CU Boulder Was Under Pressure to Protect Female Students**

Plaintiff alleges that: i) the April 2011 Dear Colleague Letter ("DCL") sounded a "call to action" grounded in the unfounded statistic that 1 in 5 women are victims of completed or attempted sexual assault while in college (Compl. ¶¶ 20-21); ii) relying on this false statistic, the DCL minimized due process protections for the accused (*Id.* ¶ 21); iii) the White House subsequently issued a report that also relied on the false statistic and focused on protecting women from sexual assault (*Id.* ¶ 24); iv) as a result of the DCL, the 2014 "Questions & Answers on Title IX and Sexual Violence" ("2014 Q&A")[5] and "Not Alone" report, colleges faced a loss of federal funding if they did not work to improve their campus climates to better protect female accusers, ultimately tipping the scales in their favor (*Id.* ¶¶ 23-31).

Plaintiff also alleges that: i) in May 2013, a female student at CU Boulder filed a complaint with OCR claiming that the University failed to issue a sufficiently severe sanction against the male respondent in her case (*Id.* ¶ 22); ii) OCR opened an investigation in response to the complaint, which was not closed *until fifteen months after* Plaintiff was suspended (*Id.*); iii) local press noted that, as a result of the investigation, CU Boulder could be referred to the Department of Justice for prosecution or that it could lose its federal funding (*Id.*); iv) in May 2014, CU Boulder was publicly named by OCR as one of the first 55 universities under investigation for violating Title IX and the announcement confirmed that the University faced a potential loss of federal funding or prosecution (*Id.* ¶ 25); v) in May 2014, the *CU Independent* announced that CU Boulder settled the case with the female OCR complainant (*Id.* ¶ 28); and vi) the female OCR complainant publicly stated that CU Boulder needed to change its policies to "really cater towards survivor needs" (*Id.*).

---

[5] See, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (Archived).

Plaintiff further alleges: i) in February 2016—after Roe filed her University complaint and police report—CU Boulder was publicly criticized for administering lax punishments in sexual misconduct cases and "fostering a ***rape culture***…which…teaches young men that drunken hookups are a space of free reign where anything goes" (*Id.* ¶ 35) (emphasis added); ii) during the investigation of Roe's allegations, Vice President Biden delivered a speech as part of the "*It's On Us* Week of Action" in which he focused on protecting women from sexual assault and called upon male students to be better men (*Id.* ¶¶ 37); iii) *It's On Us* focuses on better protecting *female* victims of sexual assault, and disseminates educational videos which portray males as sexual predators (*Id.* ¶ 34 & n. 9); and iv) Simons, Title IX Coordinator, who decided the sanction in Plaintiff's case and conducted an "administrative review" of her own decision, appeared in an *It's On Us* video during the time in which the allegations against Plaintiff were being investigated and Vice President Biden visited campus. *Id.* ¶ 89.

Defendants argue that the Complaint fails to allege facts "demonstrating" that "outside pressure actually influenced [the University], not just to aggressively pursue sexual assault cases, but to do so in a manner biased against males." Moving Br. at 7 (citing *Ruff v. Bd. of Regents of New Mexico*, 272 F. Supp. 3d 1289, 1298 (D.N.M. 2017))[6]. Yet the allegations set forth above clearly allege that CU Boulder was pressured to take an aggressive stance against males accused of sexual misconduct in order to avoid a potential loss of federal funding or prosecution, and repair its reputation for fostering a culture in which male students get away with raping female students. As further alleged in the Complaint, "Plaintiff was subjected to a biased, unfair and prejudicial

---

[6] *Ruff* is readily distinguishable from the instant case because in *Ruff* there were no allegations that the university was under pressure to better protect females from sexual assault, or to take a more aggressive stance against males accused of sexual assault. Likewise, in *Doe v. Columbia College Chicago*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), there were no allegations that the pressure faced by the college was related to gender. These cases also seem to apply a standard of proof more akin to what would be required at the summary judgment stage than to survive a motion to dismiss. *See Neal* 2017 WL 633045 at * 13 (noting that courts that rejected allegations of federal and campus pressure drew inferences against the plaintiff or applied a standard typically reserved for summary judgment).

process in violation of Title IX, designed to find him, the male, responsible for sexual misconduct and punished severely for it." Compl. ¶ 159. Plaintiff also alleges that the Title IX investigators assigned to his case were under pressure to find him responsible in order to "maintain CU Boulder's commitment to protecting female victims of sexual assault." *Id.* ¶ 114.

Defendants minimize Simons' participation in the *It's On Us* campaign during the timeframe in which CU Boulder was under OCR investigation, and Roe's allegations against Plaintiff were being investigated, as merely "raising awareness of sexual assault without drawing gendered assumptions against males." Moving Br. at 9.[7] However, Plaintiff alleges that the *It's On Us* campaign was promoted by the Vice President of the United States—a representative of the federal government—who gave a speech on campus that portrayed the campaign's goal as *protecting females*. Compl. ¶¶ 36-37. Biden's visit was publicly declared a "test of character" for the University. *Id.* ¶ 37. Plaintiff further alleges that *It's On Us* utilizes promotional materials which expressly portray men as rapists. *Id.* ¶ 34 & n. 6. These allegations are far more gender-specific than those asserted in *Columbia College Chicago*, 299 F. Supp. 3d at 955, in which the college in question sponsored "Take Back the Night" events and there was no allegation that either a key decision maker or influential government official participated in those events during the time in which the college was under OCR investigation.

Unlike *Doe v. U. of Chicago*, 2017 WL 4163960 (N.D. Ill. Sept. 20, 2017), Plaintiff, here, alleges that the University's participation in *It's On Us* was motivated by efforts to demonstrate that it was taking a more aggressive stance to address the concerns of female victims of sexual assault after being criticized for handing out lax punishments to males accused of sexual

---

[7] In support of this assertion, Defendants' cite *Doe v. Colgate University*, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017), a *summary judgment* opinion, which is currently on appeal before the Second Circuit.

misconduct. Compl. ¶¶ 22, 25, 28, 30, 34-37. These are facts from which an intent to discriminate against males can be inferred. *See Columbia U.*, 831 F.3d at 58.

*Doe v. Loh*, 2018 WL 1535495 (D. Md. Mar. 29, 2018), currently on appeal before the Fourth Circuit, is also distinguishable because in *Loh* the plaintiff generally alleged that the university participated in events to raise awareness about violence against women which did not "*standing alone* create an inference" that the university was "indifferent or hostile to the needs of the remaining student body." *Id.* at * 10 (emphasis added).

### 2.   The Lead Investigator In Plaintiff's Case Was A Women's Advocate

Plaintiff alleges that the lead investigator, Hasselbacher, an attorney who was responsible for determining whether Plaintiff violated the Student Conduct Code: i) had a dual role which included ensuring that the University was Title IX compliant (*Id.* ¶ 59); ii) worked closely with the Office of Victim Assistance (*Id.*); iii) had a background in Women's Studies and extensive career experience as an advocate for female victims of sexual assault and domestic violence (*Id.*). Hasselbacher's past experience caused her to view the evidence through a gender-biased lens. *Id.* ¶ 115. Defendants assert that this background should be disregarded because "experience working with survivors of domestic violence does not establish that [the investigator] harbors pro-female biases." Moving Br. at 10. Here, Plaintiff alleges far more than general experience. Defendants' reliance on *Doe v. University of Denver*, 2018 WL 1304530, at * 11 (D. Col. March 13, 2018) (Brimmer, J.), which is currently on appeal before the Tenth Circuit, is misplaced because it is a *summary judgment* decision. In *University of Denver*, the Court found that the only evidence adduced during discovery was that an individual involved in the investigation worked with domestic violence survivors. *Id.*

As alleged in the Complaint, gender bias can be inferred from the actions of Hasselbacher and Walker (who was far less experienced than, and influenced by, Hasselbacher), (*Id.* ¶ 116), during their investigation:

- Hasselbacher told Plaintiff that he had two business days to find an advisor and schedule a meeting or conclusions would be drawn against him while informing Jane Roe that she had unlimited time and she could participate at her convenience. Compl. ¶¶ 62, 70.

- Hasselbacher gave Plaintiff only two hours of access to the investigation file—after numerous requests for access were denied—and informed him that the investigators planned to issue a written evidence summary before his review and response to their follow-up questions. *Id.* ¶¶ 76-86. They then issued the written evidence summary prior to giving Plaintiff access to the file or asking him follow-up questions. *Id.* ¶ 86. In contrast, the investigators met with Jane Roe prior to issuing the written evidence summary. *Id.* ¶ 79.

- Plaintiff was denied access to the file because of Vice President Biden's visit to campus. *Id.* ¶ 85. Once Plaintiff accessed the file, after the written evidence summary was issued, he was precluded from conferring with his attorney or making copies of any of the documents. *Id.* ¶ 90. On May 2, 2016, Hasselbacher and Walker issued an amended written evidence summary. Plaintiff was then allowed to conduct a second file review for, again, only two hours. *Id.* ¶ 95.

- When issuing the written evidence summary, Hasselbacher told Jane Roe not to share it with anyone other than her advisor or it could be viewed as retaliation against Plaintiff. *Id.* ¶ 86. Jane Roe provided the evidence to BPD and no action was taken against her. *Id.* ¶ 88.

- Hasselbacher, and Walker, waited two months to review Plaintiff's interview with BPD, until after they had interviewed all the other witnesses and were beginning to write their final report. *Id.* ¶¶ 72-86. They observed Jane Roe's first BPD interview in person but declined to observe Plaintiff's. *Id.* ¶¶ 65-66.

- In determining that Plaintiff was responsible for non-consensual sexual contact with Jane Roe, Hasselbacher and Walker overlooked significant inconsistencies in Roe's varying accounts to find her more credible than Plaintiff. *Id.* ¶¶ 102-103. They further permitted Roe to explain away inconsistencies in the accounts of her female friends, to find their accounts credible. *Id.* ¶¶ 104 i.-ii. Hasselbacher and Walker never asked Roe for her own account, but rather asked her to respond to Plaintiff's. *Id.* ¶ 102. In contrast, Hasselbacher and Walker misinterpreted Plaintiff's account to BPD as impacting his credibility when Plaintiff was

responding to a false set of allegations, created by Detective Beckjord, which had no relationship to what Roe had alleged. *Id.* ¶¶ 105-109.[8]

- Hasselbacher and Walker issued a finding that contradicted Roe's account of what happened and misstated a number of facts. *Id.* ¶¶ 117-118.

Plaintiff also alleges that, due to the OCR investigation, Biden's visit and the public criticism against CU Boulder, Hasselbacher and Walker were "under pressure to ensure that Plaintiff be found responsible for violating the Student Conduct Code, in order to appease Jane Roe and maintain CU Boulder's commitment to protecting female victims of sexual assault." *Id.* ¶ 114. Hasselbacher and Walker did not question Roe's credibility because CU Boulder trained them to take a "trauma-informed approach" in which female complainants are presumed to be telling the truth and difficult or sensitive questions are avoided. *Id.* ¶ 115.

### 3. That Investigators Found Plaintiff "Not Responsible" for Jane Roe's Sexual Assault Allegation Does Not Dispose of His Claim of Gender Bias

Defendants argue, without factual support at the pleading stage, that because the University found Plaintiff *not responsible* for the July 2015 allegation of nonconsensual sexual intercourse with Jane Roe, he cannot allege gender bias. Moving Br. at 5-6. But Defendants failed to put those records before this Court and they would require analysis far better suited to a motion for summary judgment. As alleged in the Complaint, in January 2016, Roe reported the Spring 2014 allegation (non-consensual sexual contact) and the July 2015 allegation (nonconsensual sexual intercourse) to BPD and CU Boulder as one complaint. Compl. ¶¶ 51-58. The allegations were jointly

---

[8] As noted by Judge Martinez in *Doe v. University of Colorado, Boulder*, 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017), "credibility determinations as between a male and a female may be the most likely circumstance in which gender bias, explicit or implicit, will have an effect." According to Judge Martinez' opinion, the investigator in that case had no statement from the plaintiff against which to weigh the female complainants' credibility, and the witnesses involved supported the complainants' accounts. *Id.* Plaintiff's allegations, here, show inconsistencies in Roe's account of what happened, that the investigators mischaracterized and discredited Plaintiff's account, and that the witnesses contradicted Roe or were inconsistent. Roe also met with witnesses ahead of time to get her story straight and a key witness was not interviewed. *See* Compl. ¶¶ 101-116.

investigated by Hasselbacher and Walker who, as set forth above, were under pressure to keep up the University's public commitment to protect female victims and to appease Roe, whom they knew was pursing criminal charges against Plaintiff. *Id.* ¶¶ 66-69, 114-115. Per the Complaint, there was no evidence to support either allegation. *Id.* ¶¶ 51-57, 99-120.

That Hasselbacher and Walker found Plaintiff not responsible for one of two allegations made by the same complainant, and as part of the same investigation, does not at all negate an inference of gender bias. Quite the contrary. Based on the facts alleged, which must be taken as true and viewed in the light most favorable to Plaintiff, it is quite plausible that Hasselbacher and Walker found Plaintiff responsible for a perceived "lesser" offense because, as the male aggressor, he had to be found responsible for something, for failure to do so would have exposed Defendants to yet further criticism and another OCR complaint while the earlier complaint was still under investigation. They also could have been motivated to create the appearance of upholding CU Boulder's well-publicized policy of taking a more aggressive stance in sanctioning male respondents, striving—despite a clear lack of evidence—to make an example of Plaintiff by finding him responsible.

As further discussed *infra*, the severity of the sanction issued by Simons—an eighteen-month suspension—also suggests that gender bias was at work. It is plausible that Simons punished Plaintiff for both alleged offenses by increasing the sanction for one offense in order to keep up the appearance that CU Boulder was cracking down on males accused of sexual misconduct. Given that CU Boulder was under OCR investigation at the time, it is also plausible that CU Boulder was providing statistics to OCR concerning its sanctions, in the face of a complaint that they previously failed to issue severe enough sanctions against male respondents. *See* Compl. ¶¶ 22, 28. This could have resulted in their decision to impose a more severe sanction against Plaintiff, a male

respondent. These are issues of fact which Plaintiff respectfully submits he should be permitted to explore in discovery.

Defendants' reliance on *Doe v. Cummins*, 662 Fed. Appx. 437 (6th Cir. 2016), is inapposite. In *Cummins*, there were no allegations that the university faced public criticism of its handling of sexual assault investigations or that it was under OCR investigation. *Id.* at 453-454. The plaintiffs in *Cummins* also alleged that men were "*invariably* found responsible" for sexual misconduct violations—this is not alleged in the Complaint here. *Id.* (emphasis added). In *Cummins*, the court found that this allegation was contradicted by the fact that one of the plaintiffs was found not responsible for sexual misconduct with respect to one of two, separate complaints. *Id.* That Plaintiff, here, was found not responsible for one of two alleged violations does not, as Defendants contend, negate the inference that CU Boulder has engaged in a pattern of decision making which applies a chauvinistic view of the sexes. Moving Br. at 6. *See Neal*, 2017 WL 633045 at *10. This is because, as discussed *supra*, the allegations against Plaintiff pertain to one complainant, they were jointly investigated, and it can be inferred that the University was determined to find Plaintiff responsible for something in order to appease Jane Roe and bolster CU Boulder's reputation.

Moreover, the allegations of the Complaint here are not limited to findings of responsibility in every case in which a male was accused, but encompass the imposition of unwarranted findings against male students in order to bolster CU Boulder's reputation and harsher sanctions against males found responsible for sexual misconduct. Once CU Boulder's statistics and reports are made available, it is quite possible that they will demonstrate a pattern of finding males responsible, and issuing unusually harsh sanctions, in circumstances similar to Plaintiff's, but not doing the same in cases involving similarly situated female respondents. It is also possible that CU Boulder

（）

initiated formal investigations only with respect to males, while declining to pursue similar allegations against females accused of sexual misconduct. It is further a possibility that findings of responsibility in cases against male respondents increased after OCR commenced its investigation and/or that the severity of the sanctions issued against them also increased. There are endless possibilities as to what ultimately may be found in the University's records which may further establish Plaintiff's plausible allegations of gender bias. At this stage, however, the Court is not required to determine whether Plaintiff will ultimately prevail on the merits. *Mondragon*, 2017 WL 733317 at *4.

### 4. Simons Had A Conflict of Interest and Was Potentially Biased

The DCL and 2014 Q&A advise against university employees holding the position of Title IX Coordinator if they have other responsibilities that may create a conflict of interest. DCL at 7; 2014 Q&A at 11-12. An employee who is responsible for Title IX compliance should not be responsible for deciding a sexual misconduct case or hearing an appeal because of the potential for bias. *Id. See* Compl. ¶¶ 148, 154. Simons had a conflict of interest because, as Title IX Coordinator, she was responsible for compiling statistics for sexual misconduct complaints, including data concerning the sanctions issued, and presenting them to DiStefano. *Id.* ¶¶ 48, 123.[9]

Simons was solely responsible for determining the sanction issued in Plaintiff's case—an eighteen-month suspension when he was only 6 credits shy of graduating—which was

---

[9] Defendants assert that "evidence that a University has endeavored to comply with federal guidance…cannot support a violation of Title IX." Moving Br. at 11. However, in placing Simons in the role of Title IX Coordinator while giving her the power to sanction, and conduct an administrative review, CU Boulder did *not* endeavor to comply with federal guidance. Moreover, a university's purported compliance with federal guidance does not mean that administrators are free from bias, or cannot still be motivated by gender bias in violation of Title IX. Defendants misconstrue *Doe v. Purdue University*, 281 F. Supp. 3d at 778-79, as supporting their assertion that "Simons' dual role as Title IX Coordinator and sanctioning authority" did not create a conflict of interest that would support a Title IX claim. Moving Br. at 11. In *Purdue*, the court did not hold that there was no conflict of interest, but that an allegation of dual roles, without more, did not demonstrate gender bias. *Id.* This issue is currently under review by the Seventh Circuit. As set forth *infra* Plaintiff has alleged sufficient facts to support a plausible inference of gender bias at this stage of the proceedings.

unwarranted, given the lack of evidence, and unduly severe given Roe's allegations against him. *Id.* ¶¶ 2, 121-131.

Simons also elected to apply CU Boulder's 2016-2017 OIEC Procedures to conduct an "administrative review" of an appeal that Plaintiff filed pursuant to the 2013-2014 Student Conduct Code. *Id.* ¶¶ 46, 47(xvii), 132-140. Simons had the option of designating someone else to conduct the review but did not take this course. Compl. ¶ 49. Simons failed to reverse the sanction she issued against Plaintiff. *Id.* ¶ 133. The administrative review was a sham (*Id.* ¶¶ 132-140):

*First*, Simons' correspondence to Plaintiff, upholding her sanction, compared CU Boulder investigators, and Simons, to judges sitting in a court of law. *Id.* ¶ 133.ii.

*Second*, Simons rationalized Roe's nearly two-year delay in making a report—which was not questioned—as a result of her trauma. *Id.* ¶ 133.iii. Simons then misinterpreted the DCL as suggesting that all complainants who delay reporting are credible. *Id.* Simons' presumption that Roe was credible because she was traumatized—*i.e.* a trauma-informed approach—was an indicator of gender bias in her review. *Id.* This approach, as implemented, presumes that female complainants always tell the truth, discourages asking questions directly related to complainant credibility and presumes that male respondents are typically the sexual aggressors. *Id.* ¶ 137. *See also id.* ¶ 32 & n. 5. When a university statistically initiates formal conduct proceedings in cases predominantly—or exclusively—involving female complainants and male respondents, then a trauma-informed approach in which the female is always believed, and the male always discredited, gives rise to an inference of gender bias. The correlation between trauma-informed training and gender bias is a matter best resolved at the summary judgment stage, once a university has made its statistics and training materials available and the parties have submitted any expert reports.

*Third*, Simons overlooked the inconsistencies in Roe's account of what happened, including that she did not provide a consistent account of whether or not genital contact occurred, to justify the sanction on the false ground that Plaintiff and Roe gave "similar" accounts. *Id.* ¶ 133.v.

In the midst of OCR's investigation of CU Boulder, DiStefano hired Simons, who was publicly lauded for her previous work at the United States Department of Justice. DiStefano publicly emphasized Simons' prior role in assisting women with integration at a formerly all-male state university. Compl. ¶ 30. Simons was named OIEC Director and Title IX Coordinator, positions she held during Plaintiff's disciplinary proceedings. *Id.* ¶¶ 121-131. She worked closely with OCR during the course of its investigation of the University's failure to protect female sexual assault victims. *Id.* ¶ 123. Simons also served as the University's public voice against sexual assault. *Id.* She also publicly supported women's advocacy groups during the timeframe in which Roe's allegations were investigated. *Id.* ¶ 125.

The above-stated facts raise a plausible inference that, under the totality of the circumstances, the key decisionmakers in Plaintiff's disciplinary proceeding, Hasselbacher, Walker and Simons, were motivated to find Plaintiff responsible for non-consensual sexual contact and issue a harsh sanction against him, despite a lack of evidence to support Roe's allegations, because they were under pressure to take harsh measures against male respondents. Two of the three also had extensive career experience with *women's* advocacy. Simons served as the University's public voice against sexual assault and appeared in a video on behalf of an organization that was interested in protecting female victims of sexual assault, during a time when Vice President Biden visited campus for the express purpose of asking the University to do more to protect women. This took place during the investigation of Roe's allegations against Plaintiff.

Defendants' argument that "the problems [Plaintiff] has alleged do not point to the University's alleged desire to find men responsible because they are men" is unpersuasive here. Moving Br. at 6, 8 (citing *Doe v. University of Colorado, Boulder*, 255 F. Supp. 3d at 1078).[10] In *Doe* the court dealt with different administrators, different procedures and very different allegations than alleged here. *Id.*[11] Plaintiff respectfully submits that the court in *Doe* also failed to draw appropriate inferences in the plaintiff's favor and drew certain inferences *against* the plaintiff. For example, when addressing "the claim that the University investigates and disciplines men for sexual misconduct far more than women," the court presumed that "the majority of accusers of sexual assault are female and the majority of the accused are male." *Id.* It is not clear that this was alleged in the complaint at issue in *Doe*. Moreover, the court prematurely ruled out the possibility that CU Boulder could have a history of cases which include female respondents who were treated differently than male respondents, or even female accused whose cases were not ultimately investigated. It is also possible that, even if the respondents were all male, that the sanctions issued correlated to pressure exerted by OCR and that OCR documents would reveal that its investigation centered around the manner in which the University failed to protect female accusers—these are facts that would not have been in the plaintiff's possession at the time of pleading. *See Neal*, 2017 WL 633045 at * 13 (noting that courts that rejected allegations of federal

---

[10] Defendants also appear to suggest that nothing more has been alleged here than "pro-victim" bias. Moving Br. 6-7. Yet the allegations of the Complaint clearly state that the University favored female complainants over male respondents. In discovery, CU Boulder's data may also reveal that the University favored female complainants over male complainants, thus eliminating the notion of "pro-victim" bias. Moreover, even if the cases formally investigated at CU Boulder involved all female complainants and all male respondents, gender bias could still have infected CU Boulder's sexual misconduct process. As noted by Judge Martinez in *Doe v. University of Colorado at Boulder*, 155 F. Supp. 3d at 1076 "if enforcement officials are regularly presented with a scenario involving the same two potential classifications—nurse *and* female, taxi driver *and* ethnic minority, sexual assault suspect *and* male—there must come a point when one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally."

[11] The same is true of *Johnson v. W. State Colo. U.*, 71 F. Supp. 3d 1217, 1225 (D. Colo. 2014) (Martinez, J.) where the plaintiff failed to allege specific facts to support his claim of gender bias and alleged only a general conspiracy amongst female administrators to bring disciplinary proceedings against him. *Doe v. Trustees of Boston College*, 892 F.3d 67, 91 (1st Cir. 2018) is inapposite because it is a summary judgment opinion. *See* Moving Br. at 5.

and campus pressure drew inferences against the plaintiffs or applied a standard typically reserved for summary judgment).

Defendants also mischaracterize the Complaint as alleging that CU Boulder generally favors students alleging sexual misconduct over students who are accused of misconduct. Moving Br. at 7. However, the Complaint alleges that *inter alia* "CU Boulder possesses communications and documents evidencing a predisposition to favor *female* students alleging sexual misconduct over *male* students who are accused of sexual misconduct." Compl. ¶ 156 (emphasis added). As set forth above, and as alleged in the Complaint, if CU Boulder administrators approach sexual misconduct cases in a manner in which female complainants are to be believed, and difficult questions avoided in order to prevent re-traumatization, male respondents are discredited and denied basic rights such as cross-examination and, in turn, male students are issued harsh and unwarranted sanctions, then gender bias may be inferred.

For all of the above-stated reasons, the Court should deny Defendants' motion to dismiss Plaintiff's Title IX claim.

### III.    Plaintiff Has Plausibly Alleged A Violation of His Right to Due Process

It is unclear why Defendants have elected to challenge Plaintiff's due process claim, here, when they are presently litigating a due process claim brought by a former CU Boulder student accused of sexual misconduct—which survived a motion to dismiss—before Judge Martinez. *See Doe v. DiStefano*, No. 16-cv-1789, 2018 WL 2096437 at *8. In *Neal v. Colorado State University-Pueblo*, 2017 WL 633045 at **18-25, Judge Shaffer also held that similar allegations supported a plausible due process claim, warranting denial of the defendants' motion to dismiss. Accordingly,

and as further set forth below, the Court should deny Defendants' motion to dismiss Plaintiff's due process claim.

### A. **Plaintiff Was Entitled to Heightened Due Process Protections**

The Fourteenth Amendment to the United States Constitution provides that a state shall not deprive any person of life, liberty or property without due process of law. U.S. Const. Am. XIV. "'Under this amendment, we address two questions. The first is whether a liberty or property interest exists. The second is whether the State provided sufficient procedures.'" *Neal*, 2017 WL 633045 at *18 (citing *Brown v. U. of Kansas*, 599 Fed. Appx. 833, 837 (10th Cir. 2015)).

### 1. **Plaintiff Has Both A Property Interest and A Liberty Interest At Stake**

Defendants concede that Plaintiff has a property interest in his education that cannot be deprived without due process of law. Moving Br.at 12. Defendants assert that Plaintiff has not alleged that he has a liberty interest because he has not alleged an alteration in legal status. *Id.* Yet in *Goss v. Lopez*, the Supreme Court held that a student's liberty interest was implicated by even a 10-day suspension, if recorded in a student's education records, because those charges could "seriously damage the students' standing…as well as interfere with later opportunities for education and employment." 419 U.S. 565, 574-575 (1975). *See Neal*, 2017 WL 633045 at *20 (plaintiff's liberty interest in his good name, reputation and integrity added further weight to the interests at stake in the university sexual misconduct proceedings). In *Doe v. The Rector and Visitors of George Mason University*, 149 F. Supp. 3d 602, 613-614 (E.D. Va. 2016), the Court held that a charge of sexual misconduct "plainly calls into question [a] plaintiff's 'good name, reputation, honor or integrity.'" *Id.* (citation omitted). Also, that "common sense suffices to understand that an adjudication of responsibility for sexual misconduct carries a much more powerful stigma than an adjudication of run-of-the-mill assault or vandalism." *Id.* at 622. The

Court found that the marking of the plaintiff's transcript with a non-academic expulsion would impact the plaintiff's future educational and employment endeavors and lead to public disclosure that the plaintiff was expelled and suggest that "he had serious character defects." *Id.* at 613-614. The court added, "if this were not sufficient, the undisputed record reflects that Roe, a member of the general public, was in fact informed that plaintiff was found liable for sexual misconduct." *Id.*

Here, Plaintiff alleges that "CU Boulder deprived Plaintiff of his liberty and property interests without affording him basic due process." Compl. ¶ 178. He further alleges that he had a right to occupational liberty. *Id.* ¶ 170. "The University suspended Plaintiff—who had only 6 credits left towards his Bachelor's degree—for a period of eighteen months. At the time, Plaintiff…was enrolled in AFROTC and lost his scholarship…. His anticipated career in the Air Force was also sidelined." Compl. ¶ 6. Plaintiff further alleges that "Simons issued an unwarranted and unduly severe sanction which: i) suspended Plaintiff for 18 months; ii) banned Plaintiff from campus; iii) required him to undergo "an evaluation and treatment from a licensed sex offender provider;" iv) required proof of any court ordered or other sanctions; v) required that any application for readmission be personally approved by Simons; and vi) contained a no contact order prohibiting contact with Roe." *Id.* ¶ 126. Information about the misconduct proceedings was also shared with Jane Roe and she shared that information with third parties. *Id.* ¶¶ 87-88. Roe was also notified of the outcome of the investigation. *Id.* ¶¶ 47(xv). The investigation report and sanction will be retained for a "minimum of three years." *Id.* ¶ 47xviii.[12] These allegations raise a plausible inference that Plaintiff has a liberty interest at stake.

### 2. Plaintiff Was Denied the Heightened Due Process Protections to Which He Was Entitled

---

[12] It is unclear to Plaintiff what will happen to his transcript, and whether it will be permanently marked, an issue that would be hashed out in discovery.

As a result of CU Boulder's investigation, Plaintiff faced severe sanctions, including long-term suspension or expulsion, and was, therefore, entitled to heightened due process protections. Disciplinary proceedings require more stringent procedures because, unlike academic proceedings that involve qualitative evaluations, disciplinary proceedings "bear a resemblance to traditional judicial and administrative factfinding." *Allahverdi v. Regents of University of New Mexico*, 2006 WL 131380 at *14 (D.N.M. Apr. 25, 2006). *See Neal*, 2017 WL 633045 at *24 ("Due process for disciplinary proceedings is more extensive than for academic decisions").

Procedural due process requires, at a minimum, notice and an opportunity to be heard. *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976). Whether or not due process has been afforded depends on the facts and circumstances of the particular case. "Higher courts consistently admonish that due process jurisprudence cannot be applied woodenly." *Neal*, 2017 WL 633045 at *25 (collecting cases). Whether the State has provided sufficient procedures is determined by balancing the competing interests involved: i) the private interest affected by the official action; ii) the probable value, if any, of additional or substitute procedural safeguards; and iii) the State's interest including any fiscal and administrative burden. *Neal*, 2017 WL 633045 at *19 (citing *Brown v. U. of Kansas*, 599 Fed. Appx. at 837). Defendants do not address these factors in their motion to dismiss. Moving Br. at 12-16.

Where, as here, a plaintiff faces disciplinary action that carries significant long-term consequences—such as suspension or expulsion—then his private interest is "exceptionally robust" compared to the burden on the State in providing adequate due process protections. *Neal*, 2017 WL 633045 at **19-20. Here, as a result of being accused of sexual misconduct, Plaintiff faced the possibility of a long-term suspension or expulsion, as an outcome of the University's investigation. In fact, Plaintiff was suspended for 18 months, required to undergo "sex offender"

treatment and to personally meet with Simons to even be considered for readmission to the University. This sanction is akin to expulsion because readmission is conditioned upon Simons' evaluation of Plaintiff and therefore not guaranteed. Compl. ¶ 126. Plaintiff—who had an unblemished disciplinary record—was only 6 credits shy of graduation. *Id.* ¶ 2. For these reasons, he had an "exceptionally robust" interest, as compared to the University's, which warranted heightened due process protections.

Plaintiff alleges that his right to due process was violated when:

i.   OIEC personnel withheld service of the Notice of Investigation—at the request of BPD—until after Plaintiff was interviewed by Detective Beckjord.

ii.  Plaintiff was required to schedule a meeting within 3 days of receiving the Notice of Investigation or conclusions would be drawn against him. In contrast, Jane Roe had no time constraints placed on her throughout the course of the investigation.

iii. Plaintiff was provided no form of hearing and was permitted to ask no questions of the complainant or any other witnesses. Students accused of violations other than sexual misconduct were permitted to submit written questions to be asked of the complainant and, in certain cases, a hearing was held.

iv.  Plaintiff was denied access to the investigative file until after Vice President Biden's visit, then Hasselbacher and Walker issued the written evidence summary prior to Plaintiff's review of the file.

v.   Hasselbacher and Walker failed to question Jane Roe's credibility and misstated facts about the Spring 2014 allegation in order to find Plaintiff responsible for violating the Student Conduct Code.

vi.  OIEC failed to provide Plaintiff with any information about the Standing Review Committee, including any right to challenge the members reviewing the Confidential Investigation Report;

vii. The Standing Review Committee took less than one day to review the investigative file and read the 55-page report;

viii. Simons, who had a vested interest in the outcome of Title IX cases at CU Boulder, issued the sanction.

ix.    Plaintiff was denied the right to an appeal before an appeal committee. Students accused of violations other than sexual misconduct are given this right. Plaintiff was also entitled to an appeal, or seek leave to appeal, by an appeal committee under the Student Conduct Code.

x.    Simons tasked herself as the sole individual responsible for conducting an administrative review of Plaintiff's appeal.

Compl. ¶ 177.

Overall, "CU Boulder deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to be notified of the charges against him, his right to a fair adjudication, his right to be heard by an impartial factfinder, to question his accuser, to challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense." *Id.* ¶ 178.

### a.  <u>Plaintiff Had A Right to A Hearing With Cross-Examination</u>

Multiple courts—including Judge Shaffer of this District—have held that, a plausible due process claim exists in cases where, as here, it is alleged that a university investigation resolved into a problem of credibility and the university failed to provide the plaintiff with a formal hearing, including the right to cross-examine witnesses and present evidence. *See Neal*, 2017 WL 633045 at *25. *See also Baum*, 903 F.3d at 581-582; *Doe v. U. of Cincinnati*, 872 F.3d 393, 401-401 (6th Cir. 2017); *Lee v. U. of New Mexico*,[13] No. Civ 1:17-cv-1230, Docket No. 36 (D.N.M. Sept. 20, 2018).[14] According to the Sixth Circuit, these protections are required in serious disciplinary matters because:

---

[13] In this case the District Court also held that the preponderance of the evidence standard is not the proper standard for sexual misconduct investigations given their significant consequences.

[14] Defendants dismiss the right to cross-examination in university sexual misconduct proceedings as unnecessary because the "Tenth Circuit has not recognized such a right." Moving Br. at 16. Yet Defendants rely on numerous cases that are not only District Court opinions but outside the Tenth Circuit for arguments raised in support of their motion—including to the proposition that cross-examination is not necessary here. *Id. Doe v. Loh*, 2018 WL 1535495, which Defendants cite for the proposition that Plaintiff was somehow afforded other, unspecified mechanisms to challenge Roe's account is inapposite. In *Loh*, the plaintiff met with a Review Committee. At the meeting he was permitted to question the investigator and questions were asked of him by the Committee. He was permitted to present evidence to

> Due process requires cross-examination in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth. *Univ. of Cincinnati*, 872 F.3d at 401–02 (citation omitted). Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted. *Id.* So if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process. *Id.* at 402.

Here, Plaintiff alleges that there were competing narratives about the Spring 2014 allegation, that Roe gave inconsistent accounts to investigators, that Roe's witnesses' accounts were inconsistent with Roe's and investigators allowed her to explain away the inconsistencies, and that Plaintiff gave a consistent account that the investigators discredited. Compl. ¶¶ 101-120. There were no eyewitnesses to the encounter, other than Plaintiff and Roe, and no immediate outcry witnesses. *Id.* ¶ 104. The case clearly resolved into an issue of credibility, yet the University provided no hearing or mechanism for cross-examination.[15] Yet CU Boulder students accused of far lesser offenses such as housing violations have the right to a hearing. ¶ 47(x). Students accused of far less serious offenses are also allowed to submit written questions to the presiding conduct officer to be asked of the complainants. ¶ 47(xii). The fact that students in disciplinary proceedings other than those in sexual misconduct cases have these rights indicates that, on balance, providing a hearing and right of cross-examination to Plaintiff, and other similarly-situated students, would

---

the Committee and focus them on perceived inconsistencies in the complainant's account (who did not participate). *Id.* at 22-23.

[15] Defendants dismiss Plaintiff's allegation that the investigators made credibility determinations as mere disagreement with those determinations. This is not only incorrect, but misses that Plaintiff's purported disagreement with the investigators demonstrates the value that cross-examination would have in serious cases where significant student interests are at stake. *Doe v. Ohio State U.*, 219 F. Supp. 3d 645, 657 (S.D. Ohio 2016), has no bearing on whether cross-examination is required when credibility is at issue, but concerns whether there was a clearly established right to a particular form of investigation for purposes of determining whether the defendants had qualified immunity. Moreover, in that case the plaintiff received a hearing and was permitted to cross-examine the complainant through the hearing panel. *Id.* at 658-660. In Plaintiff's case here, the one-sided investigation was the purported "hearing."

not have been burdensome to CU Boulder. *Neal*, 2017 WL 633045 at *19 (citing *Brown v. U. of Kansas*, 599 Fed. Appx. at 837).

Defendants attempt to gloss over CU Boulder's egregious deprivation of Plaintiff's significant interests in his education and reputation, by denying him the right to cross-examination, by asserting that "nothing precluded Plaintiff from asking questions" during the course of the investigation. Moving Br. at 15. They then mischaracterize Plaintiff "as refusing to participate," which—as alleged throughout the Complaint—is untrue. *See* Compl. ¶¶ 71-98. That Plaintiff's counsel objected to the OIEC investigation has no bearing on whether or not procedures were in place through which Plaintiff could cross-examine Roe—they were not.

While Defendants criticize Plaintiff for failing to ask questions during his meetings with investigators, they point to no policy provision or handout, and describe no conversation in which Plaintiff was notified that he had the right to submit questions to be asked of Jane Roe or any of the witnesses. Moreover, at this stage of the proceedings, the allegations of the Complaint must be taken as true and every reasonable inference drawn in Plaintiff's favor. Compl. ¶ 177(iii). Per the plain language of the OIEC Procedures applied in Plaintiff's case, "The OIEC follows an investigative model…[t]here are no formal hearings." *Id.* ¶ 47(x).

### b. <u>Plaintiff Had the Right to An Impartial Process</u>

Not only do the OIEC Procedures require that the University provide a "fair, impartial and equitable investigation and resolution of any complaint," (Compl. ¶ 47(iv)), "the probative value of impartiality for avoiding erroneous decisions is unquestionably high; it is the bedrock for all procedures requisite to due process." *Neal*, 2017 WL 633045 at *22. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998) ("A fundamental principle of procedural due process is a hearing before an impartial tribunal.").

Plaintiff alleges that Hasselbacher, the lead investigator, and Simons, who determined Plaintiff's sanction and reviewed his appeal, were biased because each was involved in Title IX compliance and Simons was responsible for reporting sanction statistics to Chancellor DiStefano. *Id.* ¶¶ 59, 114-115, 123. Each was influenced by the pressure the University was under due to the OCR investigation and the University's public stance against its perceived rape culture. *Id.* ¶¶ 32, 35, 114-115, 123. Hasselbacher also took steps during the course of the investigation that were detrimental to Plaintiff, such as *inter alia* holding the Notice of Investigation until after Plaintiff's BPD interview (*Id.* ¶¶ 64-67); issuing the written evidence summary before Plaintiff reviewed the investigation file (*Id.* ¶¶ 76-86); failing to take action against Roe when she gave the evidence summary she was told to keep in confidence to BPD (*Id.* ¶¶ 86. 88); permitting Roe to explain away inconsistencies in witness accounts (*Id.* ¶ 104 i.-ii.); and asking Roe to respond to Plaintiff's version of the encounter rather than asking for her account of what happened (*Id.* ¶ 102). Plaintiff further alleges that "CU Boulder deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication…CU Boulder was under OCR investigation at the time…and potentially risked the loss of federal funding or other penalty if they found in favor of Plaintiff." *Id.* ¶ 181. These allegations sufficiently raise a plausible inference that the decisionmakers responsible for the erroneous 18-month suspension against Plaintiff were biased. *See Neal*, 2017 WL 633045 at *22 (plaintiff's allegations concerning university's self-interest in its reputation and federal funding were facts that if true would be a "substantial showing" of bias); *DiStefano*, 2018 WL 2096347 at * 9.

Defendants assert that Plaintiff fails to rebut the presumption that Simons was an impartial decisionmaker because he only alleges that Simons served as "Title IX Coordinator and sanctioner." Moving Br. at 17. As set forth above and *supra* Point II.B.4, Plaintiff has alleged far

more than merely Simons' occupation of dual roles, and his allegations are sufficient at the pleading stage. The two cases Defendants rely upon, *Riggins v. Goodman*, 572 F.3d 1101, 1112 (10th Cir. 2009) and *Hess v. Board of Trustees of Southern Illinois University*, 839 F.3d 668, 675 (7th Cir. 2016), are inapposite because they are summary judgment decisions. *See DiStefano*, 2018 WL 2096437 at **9-10 (finding CU Boulder's reliance on summary judgment opinions unpersuasive and finding that discovery was warranted on the issue of personal bias). Defendants' reliance on *Doe v. Purdue*, 281 F. Supp. 3d at 778-79, is misplaced because in *Purdue* the court addressed whether an administrator's occupation of dual roles, standing alone, was enough to allege *gender* bias. In the context of a procedural due process claim, a plaintiff need not allege gender bias, or any bias on the basis of any other legally protected group or class of individuals, any type of actual bias is sufficient. *DiStefano*, 2018 WL 2096437 at **9-10.

### c.   Plaintiff Had the Right to An Impartial Review of the Finding

Defendants contend that because, in their opinion, Plaintiff had no right to an appeal that it makes no difference that his appeal was reviewed by the same biased decisionmaker—Simons—who issued the unwarranted 18-month suspension. Moving Br. at 18. They further mischaracterize the Standing Review Committee—that was anonymous and spent less than one day reviewing Plaintiff's case behind closed doors—as an "additional level of review" that was "not required" and about which Plaintiff has no right to complain. *Id.* Defendants rely on the oversimplified statement that due process requires "only notice an opportunity to be heard," forgetting that what these elements entail depends on the seriousness of the private interest involved, as well as the circumstances of a particular case. Indeed, "'the very nature of due process negates any concept

of inflexible procedures universally applicable to every imaginable situation.'" *Neal*, 2017 WL 633045 at *19 (citing *Bd. of Curators of U. of Missouri v. Horowitz*, 435 U.S. 78, 85-86 (1978)).

Defendants further ignore that the OIEC Procedures applied in Plaintiff's case provided for review by the Standing Review Committee prior to the issuance of any sanction, thus bearing on Plaintiff's opportunity to be heard before he was disciplined. Compl. ¶ 47 (xiv). The Committee members were to receive "appropriate training regarding implementation of the Process and Procedures." *Id.* They were tasked with reviewing Hasselbacher's and Walker's investigation report for bias, thoroughness and sufficiency. *Id.* The Standing Review Committee reviewed and approved the investigation report on the same day. *Id.* Plaintiff was provided with no information about the Committee, nor did he have any opportunity to contest the finding or appear before the Committee. *Id.* ¶¶ 96-98. He also had no right to challenge the members because their identities were not disclosed. *Id.* Plaintiff further alleges that the Committee members were not adequately trained. *Id.* ¶ 98.

Plaintiff alleges that his right to due process was violated by CU Boulder's failure to provide him the right to an appeal when under the 2013-2014 Student Conduct Code—which should have been applied given that the encounter with Roe occurred in Spring 2014—provided the right to appeal "by a three-person Student Conduct Appeal Committee with broad authority to reverse the University's finding and reduce any sanction." *Id.* ¶ 46. The right to appeal was removed from the 2015-2016 OIEC Procedures applied in Plaintiff's case. *Id.* ¶ 47.xvii. Simons elected to undertake an "administrative review" of Plaintiff's case under the 2016-2017 OIEC Procedures. In making the choice to provide an additional level of review to Plaintiff's case, Simons and CU Boulder should have ensured that said review was equitable and impartial rather than, as alleged in the Complaint, a sham review undertaken by the very person who suspended

Plaintiff. *Id.* ¶¶ 132-140. Under the OIEC Procedures, Simons had the option of designating someone else to review Plaintiff's appeal letter. She did not. *Id.* ¶ 49. While it is true that university disciplinary proceedings need not mirror legal proceedings—whether civil or criminal—the review of a student's appeal by the University's Title IX Coordinator/OIEC Director, who reports sanctioning statistics to the Chancellor and decided the student's sanction in the first instance is highly suspect.[16] Such a procedure is akin to a trial court deciding a party's appeal of its own decision. This method of review raises significant questions about the fundamental fairness of the process afforded to Plaintiff.

### d. Restricting Plaintiff's Access to the Investigation File Impeded Plaintiff's Ability to Respond

Defendants minimize Plaintiff's claim that he was denied timely access to the investigation file as "failing to advance" his due process claim because he had opportunities to review and respond to the investigators' subjective, written summary of the evidence on two occasions. Moving Br. at 14. At issue is not whether Plaintiff simply had an opportunity to be heard, but whether it was "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). Plaintiff alleges facts that support a plausible claim that the University denied him this right by restricting his access to the evidence gathered during the University's investigation.

Plaintiff alleges that OIEC delayed his review of the investigation file for approximately two weeks and until *after* the investigators issued their written evidence summary. Compl. ¶¶ 82-

---

[16] Indeed, the OCR's 2014 Q&A advises that Title IX Coordinators should not sit on hearing panels or review appeals. *Id.* at 11-12.

90. Plaintiff was finally permitted to review the evidence on the day *after* the deadline for submitting his response to the written evidence summary. *Id.* ¶ 90. Plaintiff's review was limited to two hours and, at all times, an OIEC administrator was present so that Plaintiff was prevented from discussing the file with his attorney. *Id.* Plaintiff and his attorney were also prohibited from making copies of any documents in the file. *Id.* After the investigators issued an amended written evidence summary on May 2, 2016, Plaintiff was permitted to review the investigation file for an additional two hours under the same conditions. *Id.* ¶¶ 93-95. This review occurred on May 6, 2016. Thus, Plaintiff had a total of four hours to review a file which contained the statements of "Jane Roe, Plaintiff, and ten other witnesses" (Moving Br. at 2; Compl. ¶¶ 101-104). He was denied any right of review prior to responding to the first written evidence summary and given only three days before the deadline to respond to the amended written evidence summary. Compl. ¶¶ 93-95. Accordingly, there is a serious question whether the University's restriction of Plaintiff's access to the evidence file deprived him of a meaningful opportunity to be heard.[17]

### e. Withholding the Notice of Investigation Impacted the Outcome of Plaintiff's Case

As alleged by Plaintiff, the University investigators worked in tandem with BPD to deprive Plaintiff of the details of Roe's account. Compl. ¶¶ 64, 67-68, 70, 107-108, 110. BPD provided Plaintiff with incorrect details about Roe's allegations and Plaintiff appropriately responded to BPD's questions. Subsequently, the University provided Plaintiff with a Notice of Investigation that gave him a date reference and description of the Spring 2014 allegation that excluded the false details previously provided by BPD. *Id.* ¶ 110. This refreshed Plaintiff's recollection as to the

---

[17] Defendants' assertion that Plaintiff was not entitled to "discover every piece of evidence" that he desired is baseless. (Moving Br. at 14). Plaintiff has not alleged that he served discovery demands on the University and that the demands were denied, or that what was accessed was incomplete. Rather, as discussed *supra* Plaintiff was obstructed from a full review of the available evidence which deprived him of a meaningful opportunity to be heard.

details of what had occurred. Hassselbacher and Walker later discredited Plaintiff as unreliable because they believed that his answers to BPD differed from his answers to the investigators—ignoring that BPD gave Plaintiff a wholly different account of what had occurred than what was provided in the Notice of Investigation and that Plaintiff expressly informed the University's investigators of that fact when he met with them. *Id.* ¶¶ 105-111. Thus, Defendants are incorrect in their assertion that the University's failure to provide Plaintiff with a timely Notice of Investigation had no impact on whether he received adequate notice or had a meaningful opportunity to be heard. Moving Br. 13-15.

## IV.   Plaintiff's Breach of Contract Claim Should Be Dismissed Without Prejudice

Should the Court agree that Plaintiff's state law breach of contract claim is barred by the Eleventh Amendment to the United States Constitution, then Plaintiff respectfully requests that the Court dismiss the claim without prejudice for lack of subject matter jurisdiction and because Defendants have asserted no arguments relevant to the merits of Plaintiff's breach of contract claim.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss the Complaint, along with such other and further relief as the Court deems just and proper.

Dated:  December 6, 2018

Respectfully Submitted,

NESENOFF & MILTENBERG, LLP

By:  ___/s/Andrew T. Miltenberg____
     Andrew T. Miltenberg, Esq.
Kara L. Gorycki, Esq.
363 Seventh Avenue, Fifth Floor

New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com


FOSTER GRAHAM MILSTEIN &
CALISHER, LLP

By: ____/s/ John Chanin _____
        John Chanin, Esq.
360 South Garfield Street, Suite 600
Denver, CO 80209
303-333-9810
jchanin@fostergraham.com


*Attorneys for Plaintiff William Norris*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 6, 2018, I electronically filed the foregoing with the

Court's electronic filing system (CM/ECF) which will automatically cause notification to be sent

to the following counsel of record:

Erica Weston, Esq.
Associate University Counsel
University of Colorado
Office of University Counsel
1800 Grant Street, Suite 700
Denver, CO 80203
Attorney for Defendants

      /s/ Andrew T. Miltenberg