IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 1:18-cv-02243-LTB

WILLIAM NORRIS,

      Plaintiff,

v.

THE UNIVERSITY OF COLORADO,
BOULDER (through its Board, the Regents of
the University of Colorado, a body corporate)
and PHILIP P. DISTEFANO, Chancellor for
the University of Colorado Boulder, in his
official capacity,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Babcock, J.

      Plaintiff William Norris filed suit against the University of Colorado, Boulder

(the "University") and its Chancellor Phillip P. DiStefano (collectively,

"Defendants") alleging that Defendants: (1) violated Title IX of the Educations

Amendments of 1972 ("Title IX"); (2) denied Plaintiff's Fourteenth Amendment due

process rights under 42 U.S.C. § 1983; and (3) breached a contract with Plaintiff.

Compl., ECF No. 1. Before me is Defendants' Motion to Dismiss. ECF No. 8.

      After consideration of the parties' arguments, I DENY the Motion in part and

GRANT the Motion in part for the reasons set forth below.

# I.    LAW

To avoid dismissal under Rule 12(b)(6), "a complaint must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that enables the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

A court may not dismiss a complaint merely because it appears unlikely or improbable that a plaintiff can prove the facts alleged or ultimately prevail on the merits. *Twombly*, 550 U.S. at 556. Instead, a court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id.*

Conclusory statements and legal conclusions are not accepted as true; mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" will not suffice. *Khalik*, 671 F.3d at 1190–91 (quoting *Twombly*, 550 U.S. at 555). As such, when examining a complaint under Rule 12(b)(6), I disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable. *Id.* at 1191.

## II.    Background

### A.  The Interactions between Plaintiff and Jane Roe

As students at the University, Plaintiff became friends with a woman, referred to in this case under the pseudonym Jane Roe. ECF No. 1 at ¶¶ 1, 51. The two had a relationship over a year-and-a-half where they would often kiss. *Id.* at 53. During this time, two instances occurred that lead Roe to file a report with the Boulder Police Department. *Id.* at ¶¶ 52, 54, 57.

The first was in the spring of 2014. *Id.* at ¶ 52.  Plaintiff and Roe were drinking and, when alone, Plaintiff playfully pinned Roe's arms over her head and moved his hand down Roe's body towards her genitals. *Id.* Roe said "no" and Plaintiff stopped. *Id.* The two continued their friendship. *Id.* at ¶ 53.

The second incident was in July 2015. *Id.* at ¶ 54. Plaintiff and Roe engaged in sexual intercourse, which Plaintiff states he "stopped because he felt guilty about cheating on his girlfriend at the time, who was also [Roe's] close friend." *Id.* The next day, Roe stated that she did not remember the encounter, which surprised Plaintiff. *Id.* The two did not speak until January 2016 when Roe accused Plaintiff of rape regarding the July 2015 encounter. *Id.* at ¶ 56. Days after, Roe filed the report with the Boulder Police Department. *Id.* at ¶ 57.

### B.  The Criminal and University Investigations

The University's Office of Institutional Equity and Compliance ("OIEC") discovered Plaintiff's allegations made to the Boulder Police Department. *Id.* at ¶ 58. OIEC assigned Lauren Hasselbacher and Tessa Walker (the "Investigators") to investigate Roe's allegations against Plaintiff. *Id.* at ¶¶ 59, 60. The Investigators

were charged with determining whether Plaintiff, by touching Roe's genitals without her consent in the incident in the spring of 2014, violated the terms of 2013–14 Student Conduct Code. *Id.* at ¶ 61, 68. That code instituted a "preponderance of information" standard regarding the evaluation of complaints that a student violated its terms. *Id.* at ¶ 44. Additionally, the Investigators were tasked with determining whether Plaintiff violated OIEC's Sexual Misconduct Policy concerning the alleged sexual assault in July 2015. *Id.* at ¶ 69.

On January 27, 2016, the Investigators observed the Boulder Police Department's interview with Roe. *Id.* at ¶ 65. The Investigators did not observe the Boulder Police Department's January 28 interview with Plaintiff, but viewed a recording of the interview on March 24. *Id.* at ¶ 66, 84. The same day as Plaintiff's interview, OIEC sent Plaintiff a notice of investigation. *Id.* at ¶ 67. The notice of investigation read that if Plaintiff did not respond as directed, OIEC was authorized to make conclusions without his participation. *Id.* at ¶ 70. The notice of investigation gave Plaintiff two business days to find an advisor and to call and schedule a meeting with the Investigators. *Id.* Roe was notified that her participation was optional and she could confer with the Investigators at any time convenient to her. *Id.*

The next day, Roe met with her and Plaintiff's mutual friends—some of which were involved in the investigations—and relayed her side of the story to them. *Id.* at ¶ 71.

On February 3, with his mother as his advisor, Plaintiff met with the Investigators. *Id.* at ¶ 72. From February 8 to 15, the Investigators conducted three witness interviews and reviewed those witnesses' statements with the Boulder Police Department. *Id.* at ¶¶ 73–75.

On February 22, Plaintiff requested access to his OIEC investigative file which was denied. *Id.* at ¶ 76. The next day, OIEC informed Plaintiff that it would notify him when fact-gathering was complete and that he could review the summary of his interview in person at the OIEC office. *Id.* at ¶ 77.

On March 1, the Investigators again met with Roe and on March 21, she was again interviewed by the Boulder Police Department. *Id.* at ¶ 79, 81. Also on March 21, the Investigators notified Plaintiff that he could review his OIEC investigative file for a two-hour period on March 28. *Id.* at ¶ 82. They added that they wanted to ask Plaintiff follow-up questions after his review of the file and that they were drafting a written evidence summary to be issued the following week. *Id.*

On March 22, Plaintiff disputed the fairness of the process because the Investigators "planned to issue the written evidence summary prior to his review of the investigative file and response to any follow up questions." *Id.* at ¶ 83. Plaintiff asked for the Investigators' follow-up questions to be provided in advance. *Id.*

On March 28, Plaintiff's counsel asked to review Plaintiff's file the first week in April, but OIEC requested additional time because then-Vice President Joe Biden was visiting the University from April 5 to 8. *Id.* at ¶ 85. As explained *infra*, Biden's

visit was related to an initiative regarding the prevention of sexual violence on college campuses. *Id.* at ¶¶ 36–37.

On April 1, the Investigators issued a written evidence summary. *Id.* at ¶ 86. This was before Plaintiff reviewed the investigation file or answered follow-up questions. He was informed he had seven days to review and respond to the summary. *Id.* The Investigators emailed the summary to Roe, who was informed to not share it with anyone besides her advisor, "as sharing it with any witnesses or participants in the investigation could be reviewed as retaliatory." *Id.* at ¶ 87. Roe shared the summary with the Boulder Police Department and no action was taken by OIEC. *Id.* at ¶ 88.

On April 13, Plaintiff and his attorney reviewed his file for two hours with an OIEC administrator present. *Id.* at ¶ 90. Plaintiff was not allowed to make copies of any documents in the file. *Id.* On April 18, the Boulder Police Department issued a second report concerning the investigation. *Id.* at ¶ 91. On May 2, the Investigators issued an amended written evidence summary. *Id.* at ¶ 93. Three days later, Plaintiff's counsel objected to the OIEC investigation. *Id.* at ¶ 94. The next day, Plaintiff and his counsel reviewed his case file under the same circumstances as the prior review. *Id.* at ¶ 95.

On June 13, the Investigators emailed a notice of finding to Plaintiff, notifying him that he was found responsible for non-consensual sexual contact for the allegation in spring 2014. *Id.* at ¶ 119. Plaintiff was found not responsible for the alleged sexual assault in 2015. *Id.* at ¶ 69.

The Investigators informed Plaintiff that the next day, the Standing Review Committee would review his final investigative report. *Id.* at ¶ 96. The Standing Review Committee reviewed the evidence file and a 55-page confidential final report, which was issued the same day. *Id.* at ¶ 97. In the confidential final report, the Investigators found Roe's statements consistent and Plaintiff's statements inconsistent. *Id.* at ¶ 101.

Multiple times during this process, notifications sent to Plaintiff incorrectly stated that the applicable student conduct code was the 2014–15 version, instead of the code from the correct period of time, which was the 2013–14 version. *Id.* at ¶¶ 99, 119, 121.

On June 30, the University's Title IX Coordinator and OIEC Executive Director, Valerie Simons, solely determined Plaintiff's sanction. *Id.* at ¶¶ 120–22. Plaintiff was: (1) suspended for 18 months; (2) banned from campus; (3) required to undergo "an evaluation and treatment from a licensed sex offender provider"; (4) required to provide proof of any court-ordered or other sanctions; (5) required to have any application for readmission be personally approved by Simons; and (6) to have no contact with Roe. *Id.* at ¶ 126. The notice of sanction did not notify Plaintiff of any right to an appeal. *Id.* at ¶ 127. The 2013–14 Student Conduct Code permitted an appeal, but the 2015–16 OIEC procedures did not permit an appeal. *Id.*

On August 18, Plaintiff submitted a statement of appeal on the grounds that: (1) "the established procedures were not followed in a significant way and, as a

result, the factual findings and the sanction, were not correct" and (2) "the severity of the sanction was not appropriate based on the circumstances." *Id.* at ¶ 128.

On August 31, Simons notified Plaintiff that she would review Plaintiff's appeal pursuant to the 2016–17 OIEC procedures. *Id.* at ¶ 129. Simon stated that she would singularly conduct a preliminary inquiry, although under the 2013–14 Student Conduct Code, an appeal should have been reviewed by a committee. *Id.* at ¶¶ 129–130. Simons denied the appeal and upheld Plaintiff's sanction. *Id.* at ¶ 133.

In October 2017, after trial to a jury, Plaintiff was found not guilty on all criminal charges. *Id.* at ¶ 57, n.8. Plaintiff subsequently filed suit against the University on August 30, 2018. *Id.* at 1.

### C. Allegations of Gender Bias

In his Complaint and reiterated in his Response, Plaintiff levies a litany of information alleging how the University was biased against men. ECF Nos. 1 ¶¶ 19–140; 12 at 3–10. Plaintiff generally alleges evidence of bias based on: (1) federal, local, and campus pressure to comply with Title IX; and (2) biases and conflicts of interest from relevant employees of the University.

#### 1. *Federal, local, and campus pressure to comply with Title IX*

In April 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter which became known as the "Dear Colleague Letter" ("DCL"). ECF No. 1 at ¶ 19. The DCL directed colleges and universities to take immediate action to eliminate sexual harassment, prevent its recurrence, and address its effects. *Id.* Plaintiff alleges that "the DCL minimized due process protections for the accused by, among other things, eschewing any

presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution." *Id.* at ¶ 21.

Plaintiff's Complaint notes that in May 2013, a female student at the University filed a complaint to OCR claiming that it violated Title IX by not issuing a sufficient sanction against a male found responsible for sexual assault. *Id.* at ¶ 22. OCR opened an investigation against the University which garnered press coverage. *Id.* at ¶¶ 22, 25, 27, 28.

In 2014, OCR released additional guidance providing procedures for schools to follow when responding to complaints of sexual violence and "advised schools to adopt a trauma informed approach, advising, for example, that hearings should be 'conducted in a manner that does not inflict additional trauma on the complainant.'" *Id.* at ¶ 23. The same year, the White House issued a report that advocated for trauma-informed training and noted that a school risked losing federal funding if OCR found the school to have violated Title IX. *Id* at ¶ 24.

Plaintiff alleges that the University responded to these government guidances in various ways. First, in May 2014, DiStefano noted that students of the University were circulating a petition in support the White House guidance and announced that the University would "review all the White House recommendations and integrate those elements into what [it was] currently doing, all with the goal to move [it] beyond mere compliance, into leadership." *Id.* at ¶ 26.

Then, in June 2014, the University hired Simons as its Title IX Coordinator and eventually placed her as OIEC Executive Director when OIEC was created in August. *Id.* at ¶¶ 30, 47. As part of OIEC's creation, the University promulgated new processes and procedures under OIEC to govern sexual misconduct cases, replacing the student conduct codes, which remained in place for other student conduct violations. *Id.* at ¶ 47.

Two months later, in October 2014, two administrators of the University asserted during a presentation that its offices handling student conduct and victim assistance needed to work together, "noting '[a] collaborative relationship between victim services and conduct investigators is important for both the survivors and the campus.'" *Id.* at ¶ 33. In January 2015, the University held a town hall meeting related to a national anti-sexual assault campaign called "It's On Us," where it was discussed that the University was "working hard to make the process as survivor-focused as possible." *Id.* at ¶ 34.

In February 2016, a local newspaper published an opinion piece criticizing the University for "administering lax punishments in sexual misconduct cases and fostering a 'rape culture…which…teaches young men that drunken hookups are a space of free reign where anything goes.'" *Id.* at ¶ 35.

In April, Biden delivered a speech at the University as part of the "It's On Us" campaign, and in preparation of his visit, DiStefano and Simons appeared in the video supporting the campaign. *Id.* at ¶ 36. In the video, DiStefano announced that the "campaign is part of our comprehensive education and prevention

initiatives to combat sexual violence and it complements our overall efforts during the past two years to become a national model in this area." *Id.*

## 2. *Biases and conflicts of interest from relevant employees of the University*

Plaintiff alleges that Hasselbacher, one of the two Investigators, had a conflict of interest in that: (1) her job included ensuring that the University's policies and procedures complied with Title IX, but also worked closely with the University's Office of Victim Assistance and (2) she had "a background in women's studies, extensive experience as an advocate for women who have experienced domestic violence and sexual assault and also worked as a civil rights lawyer prior to joining [the University]." *Id.* at ¶ 59.

Concerning Simons, the University's Title IX Coordinator and OIEC Executive Director, Plaintiff alleges that on announcement of her hire, the University "lauded Simons' previous position working for the United States Department of Justice, including a case 'which involved the admission and integration of women at a formerly all-male state university.'" Id. at ¶ 30 (alteration omitted).

Plaintiff alleges that Simons had a conflict of interest in that she: (1) had responsibilities including ensuring the University's "compliance with Title IX, and she worked closely with the OCR during the course of its investigation of the University's failure to take action to support female sexual assault victims"; (2) "was a public voice against sexual assault"; (3) appeared in the "It's On Us" video related to Biden's visit; (4) was "responsible for compiling statistics for sexual

misconduct complaints, including examples of the sanctions issued, and reporting to [] DiStefano"; (5) "publicly supported women's advocacy groups" during the time of the University's investigation of Plaintiff; and (6) previously worked as a civil rights and education attorney "involv[ing] advocacy for female students." *Id.* at ¶¶ 123, 125.

### III.    PLAINTIFF'S TITLE IX CLAIM

Under Title IX, an educational institution may not discriminate against a person on the basis of sex. 20 U.S.C. § 1681(a). While federal funding could be withheld if Title IX is violated, there also exists an implied private right of action where both injunctive relief and damages are available. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992)).

Here, as in *Neal v. Colorado State University-Pueblo*, No. 16-CV-873-RM-CBS, 2017 WL 633045, at *9 (D. Colo. Feb. 16, 2017), "[b]oth sides in this case rely on *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994) for the legal standard, as do most of the reported cases addressing an accused person's Title IX claim for gender discrimination in a disciplinary proceeding." (collecting cases) (unpublished); *see Doe v. Univ. of Colo., Boulder through Bd. of Regents of Univ. of Colorado*, 255 F. Supp. 3d 1064, 1073–74 (D. Colo. 2017) (In *Yusuf,* "the Second Circuit was the first court to recognize a private Title IX cause of action based on the theory that a campus disciplinary proceeding was improperly motivated or affected by the respondent's sex.").

Under *Yusuf,* an "erroneous outcome" is one of the theories of liability available to a student who protests a university's disciplinary proceeding on the grounds of gender bias. 35 F.3d at 715; *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing available theories as: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions).

To adequately plead a case under an erroneous outcome theory, a plaintiff must plead: (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and gender bias. *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Yusuf,* 35 F.3d at 715. However, there are differing distinctions as to what the correct pleading standard requires in erroneous outcome cases.

## A. Applicable Pleading Standard

As an initial matter, I discuss the correct pleading standard to be used in Title IX erroneous outcome cases. The Tenth Circuit has not directly determined a pleading standard for these cases and there has been a circuit split on the issue. *See Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016) (an erroneous outcome claim is considered akin to a Title VII employment discrimination claim and is adequately plead if it alleges specific facts that support a "minimal plausible inference of discrimination"); *but see Doe v. Miami Univ.*, 882 F.3d at 589 (finding that the Sixth Circuit's Title VII jurisprudence differs from the Second Circuit, thus "a plaintiff asserting a Title IX claim must plead sufficient factual allegations to satisfy *Twombly* and *Iqbal* in alleging the required element of discriminatory intent.").

The Tenth Circuit has found that the burden-shifting framework recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to both the Title IX and Title VII sex discrimination claims. *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017). Further, the Tenth Circuit has harmonized a standard concerning *Twombly* and *Iqbal* and the *McDonnell Douglas* framework, finding that "a plaintiff should have at least some relevant information to make the claims plausible on their face." *Khalik*, 671 F.3d at 1192.

Additionally, other courts have likewise found that the standards of *Twombly* and *Iqbal* should apply to erroneous outcome claims in Title IX cases. *E.g., Doe v. George Washington Univ.*, No. CV 18-553 (RMC), 2018 WL 6700596, at *8 (D.D.C. Dec. 20, 2018) (noting the Circuit Court distinction, but did not further analyze because the plaintiff plead "enough to satisfy the Sixth Circuit's higher pleading requirements."); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 581 (E.D. Va. 2018) (reasoning that the Fourth Circuit would likely analyze the case akin to the Sixth Circuit's reasoning and thus reviewed the Title IX claim under the *Twombly* and *Iqbal* standard); *Doe v. Univ. of Colo*, 255 F. Supp. 3d at 1074–75 (finding that the court "basically agrees with the Second Circuit that Plaintiff needs no more than a 'minimally plausible inference' to satisfy the *Twombly/Iqbal* pleading standard . . . but the Court does not read this as some sort of weakening of *Twombly* and *Iqbal*. Either the complaint states a plausible claim or it does not—the degree of plausibility only becomes relevant when an 'obvious alternative explanation,' . . . overwhelms any inference of liability that might otherwise exist.").

As such, it appears that taking the tenants of *Twombly* and *Iqbal* and the

*McDonnell Douglas* framework together, a plaintiff alleging a Title IX erroneous

outcome case needs to provide "at least some relevant information to make the

claims plausible on their face." *Khalik*, 671 F.3d at 1193.

### B. Articulable Doubt

As stated *supra*, to make an adequate erroneous outcome claim, Plaintiff

must allege (1) facts sufficient to cast some articulable doubt on the accuracy of the

outcome of the disciplinary proceeding and (2) a particularized causal connection

between the flawed outcome and gender bias. Plaintiff may show the first element,

articulable doubt, by: (1) alleging particular evidentiary weaknesses behind the

finding of an offense such as a motive to lie on the part of a complainant or

witnesses; (2) particularized strengths of the defense; or (3) alleging particular

procedural flaws affecting the proof. *Yusuf*, 35 F.3d at 715.

This is not an especially high bar, as this prong had been met often in recent

cases where courts analyzed motions to dismiss. *E.g., Doe v. Baum*, 903 F.3d at

585–86 (articulable doubt cast by allegation that the university did not provide an

opportunity for cross-examination); *Doe v. Miami Univ.*, 882 F.3d at 592 (articulable

doubt cast by arguing that administrative hearing panel did not sufficiently analyze

evidentiary inconsistencies); *Doe v. Marymount Univ.*, 297 F. Supp. 3d at 585–86

(articulable doubt cast by noting a combination of: (1) procedural deficiencies; (2) an

adjudicator's decision lacking compelling evidence; and (3) inconsistency in accuser's

statements); *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289,

1299 (D.N.M. 2017) (articulable doubt cast by arguing that university police filed

criminal complaints absent probable cause, arrested the plaintiffs, and submitted a flawed report to the district attorney).

Defendants argue that Plaintiff has not sufficiently cast doubt on the outcome of the proceeding because he admits that the "2013-2014 Student Conduct Code prohibits '[a]ny intentional sexual touching, however slight, with any object, by any person upon another person, that is without consent and/or by force,' and that sexual contact includes 'intentional contact with the breasts, buttocks, groin, or genitals, …or any other intentional bodily contact in a sexual manner.'" ECF No. 8 at 4. Defendants continue that Plaintiff admits that he "pinned Jane Roe's arms over her head" and "moved his hand down Jane Roe's body towards her genitals." *Id.* Defendants posit that, at most, Plaintiff merely disagrees with the Investigators' findings that this interaction was non-consensual and Defendants conclude that this does not sufficiently cast doubt on the finding. *Id.*

Defendants' argument fails. Plaintiff notes he does not simply disagree with the Investigators' findings, but instead his Complaint sets forth a litany of grievances which he argues denied him of a fair and impartial process. In part, Plaintiff disputes the University's actions of: (1) withholding service of the notice of investigation until after Plaintiff was interviewed by police; (2) denying Plaintiff a hearing; (3) denying Plaintiff the right to cross-examine his accuser; (4) precluding Plaintiff from questioning witnesses; (5) unreasonably denying Plaintiff access to the investigation file; (6) failing to provide Plaintiff with any information about the Standing Review Committee, which reviewed the Investigators' finding; and (7)

allowing the Title IX Coordinator—who determined the sanction in Plaintiff's case—to conduct an "administrative review" of her own prior determination. ECF Nos. 1 at ¶¶ 47, 48, 57–70, 176; 12 at 12–13. In line with other cases, Plaintiff alleges sufficient facts regarding particular procedural flaws to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.

### C. Causal Connection between the Flawed Outcome and Gender Bias

In motions to dismiss regarding Title IX erroneous outcome cases, the contentious discussion primarily occurs with regards to the second element—whether the plaintiff has satisfactorily plead a causal connection between a flawed outcome and gender bias. Allegations that may sufficiently provide for the causal connection include, *inter alia*, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Doe v. Miami Univ.*, 882 F.3d at 593 (quoting *Yusuf*, 35 F.3d at 715).

Here, Defendants contend that Plaintiff did not provide a sufficient causal connection in his Complaint based on: (1) Plaintiff's claim that Defendants' process is biased against males; (2) the alleged pressure to comply with federal regulations; and (3) the fact that Plaintiff was not responsible for one of the two alleged incidents. ECF No. 8 at 5–11.

I find and conclude that Plaintiff has pled at least some relevant information regarding the investigative process sufficient to overcome the Motion on his Title IX claim. Discussed *infra*, I find that the allegations regarding Plaintiff's access to the investigative file, the alleged inconsistencies in the Investigators' findings, the

process of the administrative review, combined with the issues of public pressure, provide at least some relevant information to make the claims plausible on their face.

### 1. *Plaintiff's claim that Defendants' process is biased against males*

I first address Defendants' argument there is not a sufficient causal connection between the alleged deficiencies in its investigatory or disciplinary process and gender bias. ECF No. 8 at 6. Defendants claim that Plaintiff has not shown facts linking the University's decision process to Plaintiff's gender. *Id.*

But Plaintiff points to many aspects of the investigation that infer gender bias. ECF No. 12 at 14–28. He looks to Hasselbacher's alleged conflicts of interest and her "background in Women's Studies and extensive career experience as an advocate for female victims of sexual assault and domestic violence." *Id.* at 19.

Then, he hones in on specific decisions the Investigators made throughout the process as bolstering the inference of bias. *Id.* at 20. These include: limiting Plaintiff's response time, but allowing Roe unlimited time to participate; limiting Plaintiff's review time of the investigation file and issuing a written evidence summary before his review and without asking follow-up questions; sharing the investigation file with Roe, telling her not to disclose it to anyone other than her advisor, but not punishing her when she did; waiting two months to review Plaintiff's interview with the Boulder Police Department, but observing Roe's interview in person; overlooking numerous inconsistencies in Roe's account when they found her more credible than Plaintiff; and issuing a finding that contradicted Roe's account and misstated facts. *Id.* at 20–21.

Plaintiff further argues that the process was marred because Simons had a conflict of interest in her role as Title IX Coordinator. Plaintiff alleges that a conflict existed because Simons "was responsible for compiling statistics for sexual misconduct complaints, including data concerning the sanctions issued, and presenting them to DiStefano," yet she was solely responsible for determining Plaintiff's sanction. *Id.* at 24. Plaintiff alleges that Simons used the wrong procedures to conduct an administrative review for the claim, which was enacted under the 2013–14 Student Conduct Code. *Id.* at 25.

Plaintiff claims that Simons was improper when she: compared herself and the Investigators to judges sitting in a court of law; improperly used a trauma-informed approach; and overlooked inconsistencies of Roe's account. *Id.* at 25–26. Further, Plaintiff alleges Simons was gender biased because she "served as the University's public voice against sexual assault" and "publicly supported women's advocacy groups during the timeframe in which Roe's allegations were investigated." *Id.* at 26.

These allegations, taken together with the allegations regarding public pressure provide at least some relevant evidence sufficient to find a causal connection and, in turn, render the claims plausible on their face. *Cf. Doe v. Marymount Univ.*, 297 F. Supp. 3d at 584–88 (procedural deficiencies, including accuser credibility and investigation results, were sufficient to "nudge[] [Plaintiff's] Title IX claim over the Rule 12(b)(6) bar.").

However, I do note that Plaintiff's numerous claims regarding the backgrounds and educations of Simons and the Investigators are incongruent to an allegation of gender bias. *See Doe v. Miami Univ.*, 882 F.3d at 593, n.6 (overturning the district court's dismissal, but still noting that "[m]erely being a feminist, being affiliated with a gender-studies program, or researching sexual assault does not support a reasonable inference than an individual is biased against men."); *see also Doe v. Univ. of Denver*, No. 16-CV-00152-PAB-KMT, 2018 WL 1304530, at *11 (D. Colo. Mar. 13, 2018), *appeal filed*, (Apr. 20, 2018) (granting summary judgment in favor of the defendant, noting that the plaintiff's attempt to raise an inference of gender bias by university investigators failed because (1) "the fact that [the university's Title IX coordinator] has experience working with survivors of domestic violence does not establish that she harbors pro-female biases"; and (2) the plaintiff failed to support his "suggestion that an individual's personal experience of sexual assault necessarily renders him or her biased against men . . . .").

### 2. The effect of federal guidance, media, and campus pressure on allegations of gender bias

Defendants argue that Plaintiff fails to plead facts that reasonably allege that outside pressure influenced the University "not just to aggressively pursue sexual assault cases, but to do so in a manner biased against males." ECF No. 8 at 7. Defendants refer me to cases around the country that rejected allegations of gender bias similar to those made in Plaintiff's Complaint, including: federal guidance on Title IX; local press about a university's response to sexual misconduct

claims; an OCR investigation; and a university sponsoring events raising awareness condemning violence against women. *Id.* at 7–10.

In Response, Plaintiff states that he made sufficient allegations that the University was under pressure "to [p]rotect [f]emale [s]tudents." ECF No. 12 at 16. Plaintiff alleges that: the DCL's guidance resulted in a lack of due process by relying upon a false statistic; the White House issued its report relying upon the false statistic in focusing on protecting women from sexual assault; and colleges "faced a loss of federal funding if they did not work to improve their campus climates to better protect female accusers, ultimately tipping the scales in their favor." *Id.* at 16.

In his Complaint, Plaintiff alleges that the "It's On Us" campaign's "website prominently features statistics about female sexual assault victims, including 'female students are [four times] as likely to be victims of sexual assault than males" and that the website has "videos portraying men as rapists." ECF No. 1 at ¶ 34, n.6 (quoting It's On Us, https://www.itsonus.org (last visited Feb. 5, 2019)).

Plaintiff also relies on his allegations concerning OCR complaints, including: a "female OCR complainant publicly stated that [the University] needed to change its policies to 'really cater towards survivor needs'"; local press reporting and criticizing the University; the University's involvement with the "It's On Us" Campaign; and that the Investigators were under pressure to find Plaintiff responsible to maintain the University's "commitment to protecting female victims of sexual assault." *Id.* at 16–19. Plaintiff explains that his allegations "clearly allege

that [the University] was pressured to take an aggressive stance against males accused of sexual misconduct in order to avoid a potential loss of federal funding or prosecution, and repair its reputation for fostering a culture in which male students get away with raping female students." *Id.* at 17.

Defendants reply that, at most, Plaintiff's arguments add "up to an increased awareness of sexual assault on campuses coinciding with the 'simple fact that the majority of accusers of sexual assault are female and the majority of the accused are male.'" ECF No. 13 at 6–7. Then, Defendants posit that a plausible inference of gender discrimination cannot created by: (1) evidence of a university aggressively responding to sexual assault allegations; nor (2) an implication that pressure to respond to sexual assault allegations equates to pressure to find men responsible based on their gender. *Id.* at 7.

Courts have noted that the DCL "has led to a 'wave of litigation' brought by male university students who have been suspended or expelled after they had been found, after allegedly faulty investigations, to have violated school policies regarding sexual assault." *Doe v. Univ. of Colo*, 255 F. Supp. 3d at 1067–68 (quoting *Doe v. Brown Univ.*, 166 F.Supp.3d 177, 181 (D.R.I. 2016)); *see Doe v. Marymount Univ.,* 297 F. Supp. 3d at 582–83 (noting that commentators, including federal courts, have stated that through the DCL, "OCR sought to lower or remove perceived barriers faced by students reporting sexual assault, which naturally led to (i) the removal of certain procedural protection for alleged assailants, and (ii)

increased rates of conviction for alleged assailants based on lower burdens of proof" leading to many male plaintiffs bringing erroneous outcome claims).

At issue before judges is the difficult distinction concerning whether a pro-victim bias melds into an anti-male bias when the overwhelming majority of accusers are female and the overwhelming majority of those accused are male, I have found no Title IX erroneous outcome case where the accused is female.

Courts have repeatedly discussed whether certain pressures on universities are sufficient to allege gender bias in Title IX discipline cases. *Ruff*, 272 F. Supp. 3d at 1299. The court in *Ruff* noted the split of authority where "[o]n the one hand, there are several cases which hold that a 'pro-female, anti-male bias' can be alleged by pointing to 'pressures' from, for example, a student body critical of a University's handling of sexual assault cases . . ." while "[o]n the other hand, many cases conclude that allegations of 'pressure from the federal government to investigate sexual assault allegations more aggressively' is insufficient to allow an inference of bias." *Id.* at 1299–1301 (collecting cases).

Even keeping this dilemma between pro-victim bias and anti-male bias in mind, these myriad cases are all fact-specific and those that find that the plaintiff plead sufficient facts in his complaint seem to hinge upon whether outside pressure is enough to create a plausible claim for bias. *Doe v. Baum*, 903 F.3d at 586 (sufficient claim alleged when two years before the plaintiff's disciplinary proceeding, the federal government launched an investigation to determine whether the university's process for responding to allegations of sexual misconduct

discriminated against women and "[w]hen news of the investigation broke, student groups and local media outlets sharply criticized the administration"); *Doe v. Miami Univ.*, 882 F.3d at 593–94 (sufficient claim alleged when, in part, university faced external pressure from the federal government—the DCL—and faced lawsuits on the issue); *Doe v. Rollins Coll.*, No. 618CV1069ORL37KRS, 2019 WL 208283, at *3 (M.D. Fla. Jan. 16, 2019) (sufficient claim alleged when the complaint noted criticism of the college in the "form of adverse news coverage, campus meetings or protests, and enforcement actions . . . ."); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017) (sufficient claim alleged when accuser was part of a student-led movement attempting to reform the way the college handled sexual assault claims); *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 401–02 (W.D.N.Y. 2017) (sufficient claim alleged when, in concert with the DCL, multiple news outlets criticized the colleges' handling of sexual assault claims); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1340–41 (S.D. Fla. 2017) (sufficient claim alleged when media reported on the university's handling of sexual assault allegations on campus, the university was cognizant of the public pressure, and it curated a sexual assault awareness month).

The cases finding that an erroneous outcome claim was not sufficiently plead generally conclude that to allege that gender bias affected the outcome of a plaintiff's proceeding, he must allege facts demonstrating that outside pressure influenced the university, "not just to aggressively pursue sexual assault cases, but to do so in a manner biased against males." *Ruff*, 272 F.Supp. 3d at 1302

(complaints from student body, media reporting, and a government investigation, in part, alleged pro-victim bias, but were not sufficient to allege gender bias); *see Doe v. Loh*, No. CV PX-16-3314, 2018 WL 1535495, at *8–10 (D. Md. Mar. 29, 2018), *appeal filed*, (May 3, 2018) (attenuated claims of public pressure, campus events, and the DCL were insufficient to allege gender bias); *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 775–82 (N.D. Ind. 2017), *appeal filed*, (Dec. 18, 2017) (procedural deficiencies, pressure from the DCL, OCR investigations, and a pattern of finding only males responsible were insufficient to allege gender bias because the plaintiff did not identify "specific facts or comments by university officials that are indicative of gender bias"); *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 954–55 (N.D. Ill. 2017) (allegation lacked evidence of statement from college indicative of gender bias).

The pressure from media, the campus involvement in the "It's On Us" campaign, the statements from Simons and DiStefano, the OCR investigation, and the DCL may not *ipso facto* be sufficient. Indeed, as Defendants recount, courts have voiced concern regarding claims of anti-male bias being conflated with pro-victim bias and have highlighted aspects similar to Plaintiff's claim as not being solely sufficient.  ECF No. 8 at 8–11; *Doe v. Pennsylvania State Univ.*, No. 4:17-CV-01315, 2018 WL 317934, at *6 (M.D. Pa. Jan. 8, 2018) (denying motion, but noting that the court "agrees with that majority of courts: federal pressure to prosecute sexual assault, like accusations of a bias in favor of the accuser, supply an inference of, at most, a pro-victim bias only."); *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d

at 955 (public awareness events regarding sexual assault "are not gender-biased and instead are legitimate preventative education programs and resources that OCR has explicitly instructed universities to provide for survivors and victims of all genders"); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017) ("[I]t stands to reason that evidence that a university has endeavored to comply with federal guidance on Title IX cannot support a violation of Title IX.").

Nonetheless, the numerous allegations, taken in concert with the allegations of gender bias concerning the process of the investigation discussed *supra*, provide some relevant evidence sufficient to find a causal connection and, in turn, render the claims plausible on their face. *Cf. Doe v. George Washington Univ.*, 2018 WL 6700596, at *8 ("[T]he combination of OCR investigations, publicized demonstrations, and the [university] statement are sufficient to avoid dismissal at this point in the litigation.").

But Defendants argue that since Plaintiff was found not responsible by the University for Roe's July 2015 allegation of sexual misconduct, Plaintiff "cannot plausibly allege a 'pattern of decision-making' suggesting that gender influences the University's disciplinary process." *Id.* at 5–6. However, as discussed *supra*, Plaintiff's Complaint plausibly alleges that the University's actions may be based on bias and access to discovery may provide support for his claim. *Cf. Twombly*, 550 U.S. at 556 (a court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements). As such,

I do not address Defendants' argument that Plaintiff was not responsible for one of the allegations.

I find and conclude that the allegations of Defendants' disciplinary process, taken together with the allegations regarding public pressure, provide at least some relevant evidence sufficient to find a causal connection and, in turn, render the claims plausible on their face.

## IV.   PLAINTIFF'S DUE PROCESS CLAIM

Defendants next argue that Plaintiff failed to state a due process claim under 42 U.S.C. § 1983 because he does not have a liberty interest and, even if he did, he received sufficient notice and opportunity to be heard.

The Due Process Clause of Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Questions of due process are considered using two steps: (1) whether there exists a liberty or property interest which has been interfered with by the state; and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Lauck v. Campbell Cty.*, 627 F.3d 805, 811 (10th Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

### A.  Plaintiff's Claim of a Liberty Interest

Defendants concede that Plaintiff indeed has a property interest. ECF No. 8 at 12. However, they claim that Plaintiff does not have an additional liberty interest because he does not claim a change in legal status. *Id.* As the Due Process Clause reads that a state shall not "deprive any person of life, liberty, *or* property" and

neither party claims that the ensuing analysis would change if Plaintiff were found to have a liberty interest at stake in addition to a property interest, I proceed under the context that Plaintiff has at least a property interest in his education at the University. U.S. Const. amend. XIV, § 1 (emphasis added).

### B. Plaintiff's Claim that He Did Not Receive Sufficient Notice nor an Opportunity to be Heard

In his Complaint, Plaintiff points specifically to the following ways he alleges the University violated his right to due process:

A. Withholding service of the notice of investigation until he was interviewed by the Boulder Police Department;

B. Requiring Plaintiff to schedule a meeting within three days of receiving the notice of investigation;

C. Providing Plaintiff with no form of hearing and not permitting him to ask questions of Roe or any other witnesses;

D. Denying Plaintiff access to the investigative file until after Biden's visit and then issuing the written evidence summary prior to Plaintiff's review of the file;

E. Failing to question Roe's credibility and misstating facts about the allegation;

F. Failing to provide Plaintiff with any information about the Standing Review Committee nor notifying him of any right to challenge the members reviewing the Confidential Investigation Report;

G. Taking less than one day to review the investigative file and read the

55-page Confidential Investigation Report;

H.  Allowing Simons to issue the sanction;

I.  Denying Plaintiff the right to an appeal before an appeal committee; and

J.  Allowing Simons to solely conduct an administrative review of Plaintiff's appeal.

ECF No. 1 at ¶ 176.

Defendants argue that Plaintiff does not set forth plausible allegations of a due process violation because: (1) the University provided timely notice of the investigation and access to the investigation file; (2) the University provided Plaintiff with multiple opportunities to be heard throughout its investigation; (3) Plaintiff cannot overcome the presumption of Simons' impartiality; and (4) the law does not require Plaintiff access to an appeal and thus he cannot argue about the sufficiency of such appeal.

"The fundamental requisite of due process of law is the opportunity to be heard" and its "essence is the provision to the affected party of some kind of notice and some kind of hearing." *Lauck*, 627 F.3d at 811 (quoting *Goss v. Lopez*, 419 U.S. 565, 579) (1975) (alteration and quotations omitted). A student is afforded more stringent procedural requirements if his discipline concerns his conduct as opposed to academic issues. *Trotter v. Regents of Univ. of New Mexico*, 219 F.3d 1179, 1184 (10th Cir. 2000). However, there is necessarily not a universal set of rules with which one can comply to satisfy procedural due process in each unique situation.

*See Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (finding that due process is flexible and it "calls for such procedural protections as the particular situation demands.") (citing cases).

Rather, in determining whether a disciplinary procedure concerning long-term suspension or expulsion afforded a student due process, the Tenth Circuit follows the Supreme Court in balancing three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail. *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).

*1. Timely notice of the investigation and access to the investigation file*

Defendants argue that the timing of Plaintiff receiving notice of the investigation and the interviews with the Boulder Police Department are irrelevant to his due process claim against the University. ECF No. 8 at 13–14. Defendants maintain that they gave Plaintiff notice of his investigation before meeting with OIEC, and they provided him with a written evidence summary and an amended written evidence summary, allowing him to respond both times. *Id.* at 14. Defendants also argue that Plaintiff was not entitled to discovery "as if he were a litigant in a civil or criminal proceeding" and conclude that the University sufficiently provided notice of the charges faced and the nature of the evidence supporting the charges. *Id.* at 14–15.

Plaintiff responds that the Boulder Police Department provided him with incorrect details about Roe's allegations, but the notice of investigation excluded those false details. ECF No. 12 at 40–41. He continues that because the Investigators found Plaintiff unreliable, due to his differing answers to them and the Boulder Police Department, this alleges a plausible claim that he did not receive adequate notice or a meaningful opportunity to be heard. *Id.* at 41.

Concerning the timing and conditions of his access to the investigative file, Plaintiff takes issue with the quality of the access he received. *Id.* at 39. He alleges that OIEC delayed allowing his review of the file until after the Investigators issued their written evidence summary and dictated that he could only review the evidence one day after the deadline for submitting his response to the written evidence summary. *Id.* 39–40. On release of the amended written evidence summary, Plaintiff asserts that he was given only three days to respond. *Id.* at 40. Further, he alleges that both times he was allowed access to the file—after issuance of the written evidence summary and a subsequent amended version—he could only review the file for two hours each time with an OIEC administrator present who did not allow him to make any copies from the file. *Id.* Additionally, Plaintiff notes that he "has not alleged that he served discovery demands on the University and that the demands were denied, or that what was accessed was incomplete," but that in fact "Plaintiff was obstructed from a full review of the available evidence which deprived him of a meaningful opportunity to be heard." ECF No. 12 at 40, n.17.

These issues and others discussed in this case were analyzed by Judge Martinez in his decision in *Doe v. University of Colorado* and, specific to due process claims, his subsequent order in *Doe v. DiStefano* (so titled because the court had granted the University's motion to dismiss as to the Title IX claim, but allowed the plaintiff to amend his complaint to name a proper official as the defendant). 255 F. Supp. 3d 1064; No. 16-CV-1789-WJM-KLM, 2018 WL 2096347, at *6 (D. Colo. May 7, 2018).

Judge Martinez ruled against the defendant's tactic of distilling the plaintiff's "list of accusations into more general headings, and present[ing] case law in which courts have held that the sort of procedures [the plaintiff] requests are not required in academic disciplinary proceedings." *Doe v. DiStefano*, 2018 WL 2096347, at *8–9. Judge Martinez reasoned that the district court cases cited by DiStefano seem to apply categorical rules to standards for disciplinary proceedings, which may be true as a general matter, but potentially bucks the Supreme Court's reasoning of whether there were sufficient "procedural protections that the particular situation demands." *Id.* at *8. (quoting *Mathews*, 424 U.S. at 334) (alteration omitted).

Regarding Plaintiff's notice, Defendants in their Reply cite to *Park v. Temple University*, which held that 48 hours of notice was adequate in a similar circumstance. No. CV 16-5025, 2017 WL 368087, at *3 (E.D. Pa. Jan. 25, 2017) ("With respect to notice, even in the disciplinary setting, there is generally no right to advance notice of the charges so long as there is sufficient time afforded to respond." (citing *Goss*, 419 U.S. at 582)).

However, Plaintiff here has set forth a plausible allegation that there was indeed an insufficient amount of time to respond. Defendants used the 48-hour benchmark to show that Plaintiff was unreasonable to ask for three days of notice to respond to the amended written evidence summary. ECF No. 13 at 12. While this alone is attenuated, it overlooks the fact that "Plaintiff alleges that OIEC delayed his review of the investigation file for approximately two weeks and until *after* the investigators issued their written evidence summary." ECF No. 12 at 39–40 (emphasis in original); *cf. Doe v. Miami Univ.*, 882 F.3d at 603 (procedural due process claim sufficiently alleged when the plaintiff was not provided evidence to be used against him). While Plaintiff does not allege that he never received evidence, his allegation that he did not receive access to his file until after his deadline to respond to the Investigators' summary may be used to show a violation of his due process.

Taking Plaintiff's allegations of fact as true, his concerns regarding the timing of the notice and his conditions to access of the investigation file allege a facially plausible claim that his due process rights were violated.

### 2. *Opportunities to be heard*

Defendants also argue that Plaintiff was given a sufficient hearing when he had an opportunity to interview with the Investigators, along with a chance to respond to the Investigators' written evidence summaries, and was asked to respond to follow-up questions as the investigation proceeded. ECF No. 8 at 15. Plaintiff contends he was not provided sufficient opportunity to be heard and when a university investigation revolves around credibility, due process requires that the

plaintiff is afforded a formal hearing, including the right to cross-examine witnesses and present evidence. ECF No. 12 at 33.

Recently, the Sixth Circuit in *Doe v. Baum*, using the *Mathews* factors, unequivocally held that: "(1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." 903 F.3d at 581. The court clarified that the accused student does not always have "a right to *personally* confront his accuser and other witnesses," as universities "have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment." *Id.* at 583 (emphasis in original).

The Tenth Circuit has not so opined, but several district courts have found that a lack of meaningful cross-examination may contribute to a violation of due process rights of an accused student in a disciplinary hearing regarding sexual assault. *See Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 978–79 (S.D. Ohio 2018) (plausible procedural due process claim alleged when the plaintiff could not conduct "meaningful cross-examination"); *Neal v. Colorado State Univ.-Pueblo*, 2017 WL 633045, at *25 (recommendation from magistrate judge stating that a plausible procedural due process claim was alleged because the proceeding hinged upon an issue of credibility such that cross-examination of witnesses might have been essential).

So with the credibility of the parties in the investigation at issue *see* ECF No. 1 at ¶¶ 101–13, the lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of his due process rights.

### 3. *Opportunities of appeal*

Defendants next argue that Plaintiff's challenge to the Standing Review Committee's review of the investigation report, and Simons' review of his appeal, do not constitute evidence of a due process violation. ECF No. 8 at 17–18. Defendants maintain that because "due process requires only notice and an opportunity to be heard," Plaintiff cannot argue he deserves a right to appeal, nor can he argue about the sufficiency of the process of an appeal. *Id.* at 18.

Plaintiff responds that the Standing Review Committee's process should not be considered an additional level of review, and argues that his allegation that the Standing Review Committee only facially reviewed his file should be considered in the context of the University's procedure as a whole, not merely as aspect of an appeal. ECF No. 12 at 37. He adds that the University's decision to use OIEC process and procedures, as opposed to the 2013–14 Student Conduct Code, denied him a right to appeal. *Id.* at 38. Plaintiff states that under OIEC procedure, Simons had the option of designating someone else to review Plaintiff's appeal letter, yet chose to consider it herself. *Id.* at 39.

Defendants reply that even if the University failed to comply with its own set of rules by not using the 2013–14 Student Conduct Code, due process merely requires the University to follow "basically fair" procedures and that it did so. ECF No. 13 at 11–12.

As Defendants point out, "in the disciplinary context, a school's failure to comply with its own rules does not, in itself, constitute a violation of the Fourteenth Amendment" because "the Due Process Clause does not require the University to follow any specific set of detailed procedures as long as the procedures the University actually follows are basically fair ones." *Brown v. Univ. of Kansas*, 599 F. App'x 833, 838 (10th Cir. 2015) (citing cases) (alterations and quotations omitted) (unpublished).

However, Plaintiff provides evidence to support a plausible due process claim because his allegations establish an occurrence that could well be not "basically fair." Namely, Plaintiff was investigated for a violation of the 2013–14 Student Conduct Code. ECF No. 1 at ¶ 61. That code permitted an appeal by a committee, but the OIEC procedures did not. *Id.* at ¶¶ 127, 130. Additionally, multiple times during the investigation, notifications sent to Plaintiff incorrectly stated that the applicable code was the 2014–15 version, instead of the code from the correct period of time, which was the 2013–14 version. *Id.* at ¶¶ 99, 119, 121. As such, this allegation supports a finding that the University's procedure was unfair.

### 4. *The alleged partiality of Simons and Hasselbacher*

Finally, Defendants contend that Plaintiff has not made sufficient allegations to support a finding that Simons or the Investigators were biased, which lead to an impartial process. ECF No. 8 at 16–17. They argue that the Tenth Circuit requires a presumption of impartiality concerning the bias of a decisionmaker and Plaintiff's allegations have not overcome that burden. ECF No. 8 at 17.

But Plaintiff has set forth evidence that Simons and Hasselbacher were biased "because each was involved in Title IX compliance," "Simons was responsible for reporting sanction statistics to [] DiStefano," and they were under scrutiny due to the OCR investigation and related public pressure. ECF No. 12 at 36. I hold that, for reasons well-discussed in the Title IX analysis, Plaintiff has made allegations that plausibly allege bias in the process.

Overall, taking together Plaintiff's concerns regarding the timing of the notice and his conditions to access of the investigation file, along with his opportunity to be heard, Plaintiff plausibly alleges his right to due process was violated.

## V.    PLAINTIFF'S BREACH OF CONTRACT CLAIM

In his Complaint, Plaintiff brings a claim for relief for breach of contract against the University. ECF No. 1 at ¶¶ 184–93. Defendants move to dismiss this claim under the immunity provisions of the Eleventh Amendment. ECF No. 8 at 18. Plaintiff appears to concede the point and requests that if I find that the University is indeed immune to the claim, that I dismiss it for lack of subject matter jurisdiction without prejudice. ECF No. 12 at 41. Defendants do not argue whether the claim should be dismissed with or without prejudice.

"[A]bsent a state's consent, the Eleventh Amendment prohibits a federal court from adjudicating state-law claims against a state." *Doe v. Univ. of Colo.*, 255 F. Supp. 3d at 1086 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). No waiver has occurred. As such, I will dismiss the breach of

contract claim without prejudice. *See also* Colo. Rev. Stat. § 13–80–111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed in federal court due to the court's lack of jurisdiction).

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS that Defendants' Motion to Dismiss is:

1. DENIED regarding Plaintiff's Title IX claim (Count I);

2. DENIED regarding Plaintiff's due process claim (Count II); and

3. GRANTED regarding Plaintiff's breach of contract claim (Count III).

Dated: February 21, 2019 Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE